UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CAITLIN BERNARD M.D.,               )
                                    )
                    Plaintiff,      )
                                    )
          v.                        )          No. 1:19-cv-01660-SEB-DML
                                    )
INDIVIDUAL MEMBERS OF THE           )
INDIANA MEDICAL LICENSING BOARD     )
in their official capacities, et al. )
                                    )
                    Defendants.     )

**ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(DKT. 6)**

In recent years, several states have adopted statutes prohibiting an abortion

procedure known to medicine as "dilation and evacuation" ("D&E") and referred to by its

political opponents as "dismemberment abortion." Among these statutes is Indiana's

House Enrolled Act 1211 ("HEA 1211"), enacted on April 24, 2019. We begin by noting

that every federal court to consider these prohibitions have preliminarily or permanently

enjoined them as violations of the Due Process Clause of the Fourteenth Amendment.

Today, we join them, for the reasons given below.

## Background

Our analysis commences with (I) a review of HEA 1211, followed by (II) an

examination of the provision of D&E in Indiana and (III) a general overview of second

trimester abortion methods, including (A) D&E, (B) induction of labor, and (C)

hysterotomy. Thereafter, we review (IV) methods for inducing fetal demise before a

D&E, including (A) injections of digoxin, (B) injections of potassium chloride, and (C) umbilical cord transections. We conclude by recapitulating (V) the posture of the instant motion.

## I. HEA 1211

HEA 1211 creates a new statutory term "dismemberment abortion" and defines it as follows:

> (a) "Dismemberment abortion" means an abortion with the purpose of killing a living fetus in which the living fetus is extracted one (1) piece at a time from the uterus through clamps, grasping forceps, tongs, scissors, or another similar instrument that, through the convergence of two (2) rigid levers, slices, crushes, or grasps a portion of the fetus's body to cut or rip it off.
>
> (b) "Dismemberment abortion" does not include an abortion that uses suction to dismember a fetus by sucking fetal parts into a collection container.

Act of April 24, 2019, Pub. L. 93-2019, § 1, 2019 Ind. Acts—, 2019 Ind. Legis. Serv. P.L. 93-2019 (West) (to be codified at Ind. Code § 16-18-2-96.4) [hereinafter HEA 1211]. This term is original to this statute and its out-of-state companions.

Effective July 1, 2019, "knowingly or intentionally" performing a "dismemberment abortion" will be a Level 5 felony, *see* Ind. Code § 16-34-2-7(a), punishable by up to six years' imprisonment and a $10,000 fine, *id.* § 35-50-2-6(b), unless the "reasonable medical judgment" of the physician performing the abortion "dictates that performing the dismemberment abortion is necessary[] to prevent any serious health risk to the mother" or "to save the mother's life." HEA 1211, § 3 (internal subdivisions omitted) (to be codified at Ind. Code § 16-34-2-1(c)).

## II. D&E in Indiana

All agree that HEA 1211 by its terms prohibits D&E, which is "the usual abortion method" in the second trimester of pregnancy in the United States, *Gonzales v. Carhart*, 550 U.S. 124, 135 (2007), and "the predominant method of second trimester abortion in many parts of the world." Dkt. 29 Ex. 1, at 3. D&E is performed from early in the second trimester, beginning approximately 15 weeks after the patient's last menstrual period (LMP). Dkt. 9 Ex. 1, ¶ 22 [hereinafter Pl. Decl.]. Through 10 weeks LMP, abortions may be performed medically through administration of the chemical abortifacients mifepristone and misoprostol. *Id.* ¶ 12. Aspiration and curettage procedures are also commonly employed through the first trimester, but cease to be effective by the beginning of the second trimester. *Id.* ¶¶ 12, 16. Thus, a woman seeking a second-trimester abortion receives a D&E or one of its two alternatives, which are discussed in more detail below.

Plaintiff Dr. Caitlin Bernard, M.D., has brought this lawsuit on behalf of her patients to challenge the restrictions imposed under HEA 1211. She is a board-certified ob/gyn in Indianapolis employed by the Indiana University Health physician network. *Id.* ¶¶ 1, 5. She practices at two Indianapolis hospitals, Methodist and Eskenazi. Dkt. 34, 8:3–4 [hereinafter Pl. Dep.]. Dr. Bernard also teaches at the Indiana University School of Medicine. Pl. Decl. ¶ 5. As part of her general ob/gyn practice at these hospitals, Dr. Bernard

> provide[s] abortion services only for certain specified
> indications. The overwhelming majority of second-trimester
> [abortions] occurring in Indiana are because of fatal or serious

> fetal anomalies. The identification of many major genetic or anatomic anomalies in the fetus, including anomalies that may cause the death of the fetus at, or shortly after, birth, generally occur in the second trimester. These might include such things as an intracranial mass in the fetal brain, neural tube defects such as spina bifida and anencephaly, or other disorders related to autonomic function. The remainder are because of health risks to the mother or because the pregnancy is the product of rape.

*Id.* ¶ 15. At Methodist and Eskenazi, Dr. Bernard performs only second-trimester abortions before fetal viability and before 21 weeks 6 days LMP. *Id.* ¶ 8. These abortions are all performed by D&E unless the patient requests another procedure. *Id.* ¶¶ 17, 39.

In addition to Dr. Bernard, only one other physician in Indiana performs D&E procedures: Dr. Hua Meng, Pl. Dep. 35:10–11, an ob/gyn also employed by the Indiana University Health physician network who practices at the same Indianapolis hospitals as Dr. Bernard. Dkt. 36, 7:21–22, 10:11–13 [hereinafter Meng Dep.]. Dr. Bernard is also aware that Dr. Katherine McHugh (formerly a plaintiff in this case, *see* Dkt. 21) has performed D&E in the past "and wishes to be able to do so in the future." Pl. Decl. ¶ 40. Neither Dr. Bernard nor Defendants are aware of any other Indiana physicians who perform or have performed D&E.

The Supreme Court in *Gonzales* described the D&E procedure as follows:

> Although individual techniques for performing D & E differ, the general steps are the same.
>
> A doctor must first dilate the cervix at least to the extent needed to insert surgical instruments into the uterus and to maneuver them to evacuate the fetus. The steps taken to cause dilation differ by physician and gestational age of the fetus. A doctor often begins the dilation process by inserting osmotic dilators, such as laminaria (sticks of seaweed), into the cervix. . . . [T]he length of time doctors employ osmotic dilators

varies. Some may keep dilators in the cervix for two days, while others use dilators for a day or less.

After sufficient dilation the surgical operation can commence. The woman is placed under general anesthesia or conscious sedation. The doctor, often guided by ultrasound, inserts grasping forceps through the woman's cervix and into the uterus to grab the fetus. The doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart. For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman. The process of evacuating the fetus piece by piece continues until it has been completely removed. . . . Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed.

Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid. Fetal demise may cause contractions and make greater dilation possible. Once dead, moreover, the fetus' body will soften, and its removal will be easier. Other doctors refrain from injecting chemical agents, believing it adds risk with little or no medical benefit.

*Gonzales*, 550 U.S. at 135–36 (citations omitted). Dr. Bernard and Defendants here describe the procedure in materially identical terms. Pl. Decl. ¶¶ 17–20; Dkt. 30, ¶¶ 10–13 [hereinafter Francis Decl.].

When Dr. Bernard performs D&E, she uses laminaria. Pl. Decl. ¶ 17. If the pregnancy is more than 17 weeks LMP, the procedure takes two days: Dr. Bernard inserts the laminaria on the first day; the patient leaves the hospital and returns on the next day for the procedure. *Id.* ¶ 18. If the pregnancy is less than 17 weeks LMP, dilation and evacuation happen on the same day. *Id.* Once the cervix is sufficiently dilated, evacuation

"generally takes no more than 10–15 minutes." *Id.* ¶ 20. Dr. Bernard uses ultrasound imaging to confirm the uterus has been completely evacuated. Pl. Dep. 19:1–4.

## III. Second-Trimester Abortion Methods

"Approximately 1 in 4 women [in the United States] obtain an abortion by the age of 45." Dkt. 12 Ex. 1, ¶ 9 [hereinafter Davis Decl.]. Most are poor. *Id.* The risk of death from an abortion (less than 1 in 100,000) is fourteen times lower than the risk of death from childbirth (8.8 in 100,000) and "significantly lower" than the risk of death from common outpatient procedures such as colonoscopy (2.9 in 100,000). *Id.* ¶ 10. These risks increase with time, however, from 0.1 in 100,000 at 8 weeks LMP and earlier to 8.9 in 100,000 at 21 weeks LMP and later. Dkt. 40 Ex. 11, at 25 [hereinafter *ACOG Practice Bulletin No. 135*].

Approximately 90 percent of abortions are performed in the first trimester of pregnancy. *See id.* at 22. Women obtain second-trimester abortions because they did not know they were pregnant in the first trimester; because they could not access an abortion provider or obtain funding for an abortion in the first trimester; and because, as Dr. Bernard explains *supra*, major anatomic or genetic abnormalities are most commonly detected in the second trimester. *Id.* "Poverty, lower education level, and having multiple disruptive life events[] have been associated with higher rates of seeking second-trimester abortion." *Id. See also* Dkt. 30 Ex. 2, at 8 ("[T]he known risk factors associated with presenting for second trimester abortion include: adolescence, drug and alcohol addiction, poverty, difficulty obtaining funding for the abortion, and African-American race."). Unprompted changes of heart are apparently not among the common motivators for

seeking a second-trimester abortion. In any event, the factors that lead women to seek second trimester abortions "are all part of the complexity of women's lives, complexity that the pregnant woman herself best understands." Dkt. 30 Ex. 2, at 8.

A.  *D&E*

"Induced abortion is the second most common surgery for reproductive-aged women in the United States, after cesarean delivery." Soc'y Family Planning, *Clinical Guidelines: Induction of Fetal Demise Before Abortion*, 81 Contraception 462, 462 (2010) [hereinafter *Induction of Fetal Demise Before Abortion*]. The "vast majority" of second-trimester abortions, as high as 95 percent, are performed by D&E. *ACOG Practice Bulletin No. 135* at 22. *See also* Dkt. 29 Ex. 1, at 4 ("99% of abortions between 13–15 weeks, 95% between 16–20 weeks, and 85% at 21 weeks or later."); Dkt. 40 Ex. 9, at 77 ("the majority of procedures performed between 14 and 20 weeks' gestation"). And the "vast majority" of D&Es are performed before 18 weeks LMP. Davis Decl. ¶ 21. *Also id.* ¶ 29. D&E is generally recognized as the "fastest, safest, and most common method" of second-trimester abortion. Pl. Decl. ¶ 22. *Also* Davis Decl. ¶¶ 7, 15; Dkt. 40 Ex. 1, ¶ 9; Dkt. 40 Ex. 3, ¶ 26 [hereinafter Davis Reply Decl.]; Dkt. 40 Ex. 9, at 20, 78; *ACOG Practice Bulletin No. 135* at 26.

The complication rate ranges from 0.05 percent to 4 percent; the major-complication rate is approximately 1 percent. Dkt. 40 Ex. 9, at 78–79. Potential complications of D&E include hemorrhage requiring transfusion (0.1 to 0.6 percent of cases); retained products of conception in the uterus (less than 1 percent of cases); and uterine perforation (occurring when an instrument punctures the uterus, often a "sub-

clinical" condition that may "resolve by [itself] and without any long-term damage[,]" Dkt. 40 Ex. 10, ¶ 5. *Accord* Dkt. 42 Ex. 1 18:15–19:22 [hereinafter Second Francis Dep.]) (0.2 to 0.5 percent of cases); *ACOG Practice Bulletin No. 135* at 25–26. Infection and cervical laceration may occur in any second-trimester abortion. *ACOG Practice Bulletin No. 135* at 25–26.

B. *Induction*

The only nonsurgical alternative to D&E in the second trimester is abortion by inducing delivery of a previable fetus, or "induction abortion." "Labor induction abortion affects expulsion of the fetus from the uterus without instrumentation." Dkt. 31 Ex. 1, at 2 [hereinafter *Society of Family Planning Guidelines*]. This procedure, like its first-trimester analogue, is also sometimes called a "medical abortion," but we will use "induction" only to distinguish the procedures. *Accord id.* "Under this method a physician uses medications to induce labor and delivery." Pl. Decl. ¶ 23. Common agents include mifepristone, misoprostol, oxytocin, and ethacridine lactate. *Society of Family Planning Guidelines* at 3. Induction is generally "safe" but takes longer, costs more, and "is associated with a greater risk of complications" than is D&E. *ACOG Practice Bulletin No. 135* at 23.

As for timing and duration, relative to induction "[t]he timing of D&E is predictable, and although it may require preoperative outpatient visits for cervical preparation, the procedure usually is faster . . . ." *ACOG Practice Bulletin No. 135* at 26. Induction abortion "may take 2–3 days to occur, during which time the woman has to be hospitalized as an inpatient. Moreover, the woman has to go through labor, which may

involve hours of pain requiring significant medication or anesthesia." Pl. Decl. ¶ 23.

*Accord* Davis Decl. ¶ 17. However, induction may take significantly less than two or

three days, particularly if mifepristone and misoprostol are used in conjunction, which

"reduce[s] the median induction-to-abortion interval to as low as six hours[.]" Dkt. 32 Ex.

1, at 9 [hereinafter *Complications After Second Trimester Abortion*].

As for cost, D&E "may be more cost-effective than [induction] abortion." *ACOG*

*Practice Bulletin No. 135* at 26. "An induction abortion may cost more than $20,000 in

Indiana, and a D&E may cost less than half of that." Pl. Decl. ¶ 24. Private insurance

coverage of abortion costs is variable and state and federal public insurance coverage is

unavailable. *Id.*

As for complications, "[a] comparison of D&E and induction mortality rates from

1972 to 1987 showed that D&E had lower death rates under 20 weeks of gestation, while

induction had lower rates after 20 weeks." *Society of Family Planning Guidelines* at 4.

"Retained [products of conception] or incomplete abortion has been reported in less than

1% of cases of D&E, but occurs in at least 8% of cases of medical abortion that involve

use of the mifepristone regimen[,]" and "[i]n several cohort studies, incomplete abortion

was significantly more common after medical abortion with misoprostol" as well. *ACOG*

*Practice Bulletin No. 135* at 25. *See also Complications After Second Trimester Abortion*

at 7–8. The rate of retention may be as a high as 10 to 33 percent. Davis Decl. ¶ 18. In Dr.

Bernard's experience, "following an induction a significant percentage of women have a

retained placenta and must undergo an additional surgical procedure to have it removed."

Pl. Decl. ¶ 25. The "additional procedure" is aspiration, sharp curettage, or D&E, in cases

of completely failed induction ("when the fetus is not expelled within a specific timeframe," *Society of Family Planning Guidelines* at 2). Davis Decl. ¶ 18. Dr. Meng estimates that 40 percent of his patients require additional intervention following induction of labor. Meng Dep. 24:2.

Other complications include hemorrhage requiring transfusion at a rate roughly comparable to D&E (0.7 of cases versus 0.1 to 0.6 percent of cases, respectively), *but cf. Complications After Second Trimester Abortion* at 8 ("The higher proportion of women requiring blood transfusion after medical induction compared to D&E is concerning and deserves further study."), and uterine rupture at an unknown rate. *ACOG Practice Bulletin No. 135* at 25. ("[T]here is much debate about whether women who have had a prior caesarean delivery are at higher risk for this complication. *Complications After Second Trimester Abortion* at 9.) In Dr. Bernard's experience, uterine rupture is "rare" but "can be life threatening" when it occurs. Pl. Decl. ¶ 25. *Accord* Davis Decl. ¶ 18. Again, infection and cervical laceration may occur in any second-trimester abortion. *ACOG Practice Bulletin No. 135* at 25–26. Overall, D&E is "associated with fewer complications (up to 4%) than [induction] abortion involving misoprostol[-only] regimens (up to 29%)[.]" *Id.* at 26. Induction using both misoprostol and mifepristone may narrow this gap, *id.*, though does not eliminate it. *Complications After Second Trimester Abortion* at 7. (As a general matter, "[t]he only large trials comparing [induction] and [D&E] were carried out . . . prior to the availability of mifepristone" in the United States, necessitating further research comparing D&E with modern induction methods. Dkt. 32, at 9.)

Given a choice, most women prefer D&E to induction. *ACOG Practice Bulletin No. 135* at 26–27; *Complications After Second Trimester Abortion* at 9; Davis Decl. ¶ 18; Davis Reply Decl. ¶ 25; Pl. Decl. ¶ 26; Dkt. 29 Ex. 1, at 4. A need for fetal autopsy, *ACOG Practice Bulletin No. 135* at 26, or a desire to "bond[] with the fetus after delivery," Dkt. 29 Ex. 1, at 5, may render induction the preferred method, however. *Also* Meng Dep. 12:12 ("If the patient wants the fetus intact.").

One study designed to compare outcomes of midtrimester D&E versus induction "failed to recruit its target sample size because most potential study participants strongly preferred D&E and declined to be randomized." *ACOG Practice Bulletin No. 135* at 26. Another study found that women who had undergone D&E "reported less pain and were more likely to say they would opt for the same procedure again compared with those who underwent induction with mifepristone and misoprostol[.]" *Id. Accord* Dkt. 29 Ex. 1, at 4; *Complications After Second Trimester Abortion* at 4 ("significantly more pain" reported for induction versus D&E). Further, "many patients" view D&E as "less emotionally challenging than induction." *ACOG Practice Bulletin No. 135* at 26–27. Induction abortions "are often performed in a labor and delivery area, which can be psychologically challenging for some women, especially those who are obtaining an abortion after learning of a devastating fetal diagnosis." Davis Decl. ¶ 17. "Several authors agree that D&E is emotionally easier for a patient [than induction] because she does not have to deliver a fetus that may show signs of life." Dkt. 31, at 1.

"But though the emotional trauma of the [D&E] experience is reduced for the patient [relative to induction], it is increased for those who perform the abortion." *Id.*

Physicians, therefore, may prefer induction to D&E for emotional or other personal reasons, as Dr. Christina Francis, M.D., a board-certified ob/gyn in Fort Wayne, explains with reference to herself and the physicians with whom she is personally familiar. Francis Decl. ¶ 15. (Some physicians may conflate their views with their patients'. *See ACOG Practice Bulletin No. 135* at 28 ("Although many obstetric providers believe that women terminating a pregnancy for fetal anomalies and fetal demise prefer induction of labor to D&E, this may not be the case.").) Indeed, "much of the emotional burden of the [D&E] procedure is borne by the physician." Dkt. 32 Ex. 1, at 10. *See also* Dkt. 30 Ex. 2 (discussing emotional and moral burdens of second-trimester abortions on physician; acknowledging risk that discussion would be "taken out of context and used as evidence for further abortion practice restrictions").

Physicians also may prefer induction to D&E because they view D&E as "barbaric." Francis Decl. ¶ 16. Setting aside private religious or philosophical opinions on zygotic, embryonic, or fetal personhood, *see* Dkt. 40 Ex. 2 60:17–20 [hereinafter First Francis Dep.]; Second Francis Dep. 56:10–58:22; *see generally* John J. Miklavcic & Paul Flaman, *Personhood Status of the Human Zygote, Embryo, Fetus*, 84 Linacre Q. 130 (2017), some physicians may decline to perform D&E because they believe "a fetus is likely able to feel pain[.]" Francis Decl. ¶ 17.

However, this opinion is contrary to the great weight of current medical evidence.

> A [2005] multidisciplinary review of the medical evidence
> concluded that a fetus cannot experience pain until 29 weeks
> of gestation at the earliest, when thalamocortical connections
> are first present. . . . This review shows evidence that both
> withdrawal reflexes and hormonal stress hormones can be

elicited by nonpainful stimuli and can occur without
conscious cortical processing. Therefore, the best indicator as
to when a fetus has potentially the capacity to experience pain
is the development of the thalamocortical axons, which do not
occur until at least 29 weeks of gestational duration; however,
their functionality within the intrauterine environment has not
been determined. With the difficulty of establishing any clear
way to measure fetal pain and the lack of specific markers for
fetal pain, any potential pain of the means of inducing fetal
demise cannot be assessed either.

*Induction of Fetal Demise Before Abortion* at 464. *Accord* Dkt. 40 Ex. 1, ¶¶ 38–49 ("[A]

widespread consensus exists in the medical and scientific community that fetal pain is not

possible before at least 24 weeks LMP.") [hereinafter Ralston Decl.]; Dkt. 42 Ex. 1, at 38

("[T]he fetus does not even have the physiological capacity to perceive pain until at least

24 weeks of gestation.").

In all, D&E is regarded as the preferred method of second-trimester abortion

unless trained D&E providers are unavailable. *ACOG Practice Bulletin No. 135* at 26;

Davis Reply Decl. ¶ 26; Dkt. 31 Ex. 2, at 3; *Complications After Second Trimester

Abortion* at 3 ("Current evidence suggests that, given trained providers and where

otherwise feasible, D&E is preferable to medical induction."); Dkt. 40 Ex. 9, at 23

("When abortion by aspiration is no longer feasible, D&E and induction methods are

used. D&E is the superior method; in comparison, inductions are more painful for

women, take significantly more time, and are more costly."). Dr. Bernard "certainly

would not recommend that [her] patients undergo an induction rather than a D&E unless

the patient requested an induction[,]" Pl. Decl. ¶ 39, though she "[a]lways" offers both

options to her patients. Pl. Dep. 25:25. *Accord* Meng Dep. 12:1–8 ("If the patient does

not want [D&E] done, we do not do it. . . . [But, in general, if] the patient wanted the termination of the pregnancy in the second trimester, I would recommend the safest route, safest procedure, and that would be the D&E.").

C. *Hysterotomy*

The only surgical alternative to D&E in the second trimester is a hysterotomy abortion. "A hysterotomy is an incision in the abdomen and uterus similar to what is performed during a caesarean section and other uterine surgeries." Dkt. 40 Ex. 10, ¶ 4. This major surgical procedure is "associated with a much higher risk of complication than D&E or [induction] abortion and should only be performed when the latter two procedures are contraindicated." *ACOG Practice Bulletin No. 135* at 24. There is no evidence that any physician recommends hysterotomy over D&E, as a general matter.

## IV. Fetal Demise

All agree that, because HEA 1211 applies only to a "living fetus," HEA 1211 does not prohibit D&E when fetal demise has been induced before the evacuation and any concomitant disarticulation.

A recent survey of abortion providers' fetal-demise practices cited by Defendants notes that "[i]nducing fetal demise is not without controversy, as it involves risks to patients without associated medical benefit, making it difficult to justify from an ethical standpoint." Colleen C. Denny *et al.*, *Induction of Fetal Demise Before Pregnancy Termination: Practices of Family Planning Providers*, 92 Contraception 241 (2015) [hereinafter *Induction of Fetal Demise Before Pregnancy Termination*]. The survey found that, of the 105 responding abortion providers (62 percent of 169 eligible respondents),

55 (52 percent) attempted to induce fetal demise before performing the abortion. *Id.* Seventeen respondents indicated their decision to induce demise was made on a case-by-case basis. Of the 38 remaining respondents, physicians who attempted to cause demise beginning at a specific gestational threshold (36 percent of all respondents), none attempted to induce fetal demise prior to 17 weeks LMP; one attempted demise beginning at 17 weeks LMP; five beginning at 18 weeks; three at 19 weeks; 16 at 20 weeks; none at 21 weeks; five at 22 weeks; and four at 23 and 24 weeks and later.[1] *Id.* (The remaining four respondents' practices do not appear to be accounted for.)

A larger and more recent survey found that "'74% (123/167) of clinicians who reported performing D&Es at 18 weeks LMP or greater did not routinely induce preoperative fetal demise,' and among the minority (26%) who do use demise procedures, the vast majority (70%) do so only for procedures at 20 weeks LMP or greater." Davis Reply Decl. ¶ 15 (emphasis omitted) (citing Katharine O. White *et al.*, *Second-Trimester Surgical Abortion Practices in the United States*, 98 Contraception 95 (2018)). These data support Dr. Bernard's characterizations of inducing pre-D&E fetal demise as a "minority" practice. Pl. Decl. ¶ 28. *Also* Davis Decl. ¶ 21; Davis Reply Decl. ¶ 15.

Where physicians induce demise before performing a D&E, it is not done to increase the safety of the procedure. "No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester [induction] or surgical abortion."

---

[1] Recall that Dr. Bernard performs D&Es from 15 weeks LMP through 21 $^{6}/_{7}$ weeks LMP.

*ACOG Practice Bulletin No. 135* at 24. "To demonstrate whether second-trimester

abortion is made safer by [inducing prior fetal demise], additional [randomized controlled

trials] are necessary. . . . To justify the harm of the documented increase[s] [in

complication rates], a significant increase in D&E safety would seem warranted."

*Induction of Fetal Demise Before Abortion* at 470, *cited at inter alia* Davis Decl. ¶ 20.

*Also* Dkt. 40 Ex. 9, at 234 ("Research is limited, but the few existing comparative studies

suggest that [the most commonly used methods of inducing fetal demise before a D&E]

do not confer a clinical benefit and may increase risks.").

Where fetal demise is induced, "[t]he reasons most frequently cited for this

practice are avoiding prosecution, facilitation of D&E abortion, patient preference and

avoiding extramural [i.e., outside the healthcare facility] abortion with signs of life." Dkt.

33, at 1. *Also* Dkt. 40 Ex. 9, at 234 ("Fetal demise is induced before dilation and

evacuation . . . by some abortion providers in the belief that it facilitates an easier, faster

and safer evacuation. Other frequently cited reasons for this practice are patient

preference, avoiding prosecution, and avoiding extramural delivery with signs of life.").

The last of these reasons will be addressed relative to each method of causing fetal

demise, discussed below.

As for avoiding prosecution, "[p]assage of the Partial-Birth Abortion (PBA) Ban

Act in 200[3]," sustained by the Supreme Court in *Gonzales v. Carhart*, 550 U.S. 124

(2007), "resulted in a change in US abortion practice for legal reasons without medical

indication." *Id.* The federal statute prohibits a variant of D&E known as "intact" D&E.

*See Gonzales*, 550 U.S. at 136–37, 146–47. Though not required to do so by the statute,

abortion providers may induce prior fetal demise as a prophylactic against liability.

*Induction of Fetal Demise Before Abortion* at 462; *Induction of Fetal Demise Before Pregnancy Termination* at 241; Dkt. 33, at 1; Dkt. 40 Ex. 9, at 234.

As for facilitation of the D&E procedure, prior demise does not in fact appear to make D&E faster or easier for the physician. *ACOG Practice Bulletin No. 135* at 24; *Society of Family Planning Guidelines* at 11; Dkt. 35 Ex. 1, at 5–6. *But see* Dkt. 40 Ex. 9, at 238 (nonrandomized study finding reduction in mean procedure time with prior demise).

As for patient preference, one study of inducing demise to facilitate D&E found that 92 percent of study participants preferred to induce demise before undergoing the procedure. Dkt. 35 Ex. 1, at 2. But the authors of that study recommended interpreting this data "cautiously because only patients who were willing [to have the demise procedure performed] entered the trial." *Id.* at 6. "This question was posed to patients within the context of a clinical trial in which many of them believed the injection might make their abortion safer[,]" though the trial found it did not. *Induction of Fetal Demise Before Abortion* at 464. "Also, the social acceptability of a positive response may have skewed the results." *Id.* "[B]y contrast, in a different study when patients were offered the option not to undergo digoxin injections, the vast majority—81%—declined." Davis Reply Decl. ¶ 13 (citing Aileen M. Gariepy *et al.*, *Transvaginal Administration of Intraamniotic Digoxin Prior to Dilation and Evacuation*, 87 Contraception 76 (2013), Dkt 33.).

The parties discuss three specific methods for causing fetal demise: injecting digoxin intrafetally (that is, into the fetal body) or intra-amniotically (that is, into the amniotic sac, the sac containing amniotic fluid in which the fetus gestates); injecting potassium chloride (KCl) intracardially (that is, into the fetal heart) or intracranially (that is, into the fetal head); and transecting (that is, cutting) the umbilical cord. Below we discuss issues particular to each method.

A. *Digoxin*

Digoxin is generally used to treat certain heart conditions. Davis Decl. ¶ 22. "To attempt to induce fetal demise with digoxin, a physician uses ultrasound guidance to pass a long spinal needle through the woman's abdomen, or vagina and cervix, into the uterus. After confirming correct needle placement, the physician injects the digoxin intrafetally or intraamniotically." *Id.* There is no authority supporting its use before 17 weeks LMP,[2] Dkt. 40 Ex. 11, 108:4–109:24 [hereinafter First Berry Dep.], and such use does not appear in the record before us.

The parties have submitted several studies of digoxin's safety and effectiveness as a precursor to D&E, which we now summarize.

One study designed to "examine the efficacy of digoxin for decreasing operative time, difficulty, and pain of late second-trimester [D&E]," Dkt. 35 Ex. 1, at 2, in which the average gestational age was 22 ½ weeks LMP, *id.* at 4, found that digoxin did none of these things. The study excluded obese women, women in renal failure, and women with

---

[2] Recall that Dr. Bernard performs D&Es from 15 weeks LMP through 21 $^6/_7$ weeks LMP.

uncontrolled hyperthyroidism because digoxin injections are contraindicated for these patients. *Id.* at 3. The digoxin was injected intra-amniotically 24 hours before the D&E; the study found "an unacceptable high rate of spontaneous abortion" if the digoxin were injected 48 hours before the procedure. *Id.* at 6.

Digoxin induced fetal demise in 57 of 62 cases, a failure rate of 8 percent. *Id.* at 4. "[A]t best, treatment with digoxin shortened the [D&E] procedure no more than 1.9 minutes and at worst, lengthened it by 3.3. minutes." *Id.* Digoxin did not reduce the pain of the procedure for the patient nor its difficulty for the physician. *Id.* at 5. Patients treated with digoxin experienced significantly more vomiting than patients who received a placebo. *Id.* at 6. The study authors concluded that digoxin use, having little or no clinical benefit in this context, could be justified by patient preference, but that "[f]urther study is needed to determine whether patients would truly prefer digoxin, even if it does not decrease procedure time, difficulty, or pain." *Id.*

Another study set out to compare transabdominal and transvaginal intra-amniotic administration of the digoxin. Dkt. 33. Transabdominal administration is more common but can increase patient discomfort and the difficulty of the procedure, especially in obese patients. *Id.* at 2. Of 134 women who were invited to participate, only 26 (19 percent) agreed. *Id.* at 4. The setting in which the study was performed routinely induced fetal demise by transecting the umbilical cord at the time of the D&E, so the patients' choice was between preoperative demise by injection and demise at the time of operation by transection. *See id.* at 5. The 108 women (81 percent) who declined reportedly based their decisions on discomfort with inducing preoperative demise (that is, discomfort at the

prospect of carrying a dead fetus), desire to avoid unnecessary treatments, fear of pain, uninterestedness in participating in a research study, and fear of labor or membrane rupture. *Id.* at 4.

Digoxin administration was successful in 24 of the 26 women who participated; both failed cases involved obesity or morbid obesity of the patient. *Id.* at 4–5. In 2 of the 24 successful cases, more than one injection attempt was required. *Id.* at 5. In all 24 successful cases fetal demise had been achieved by 29 hours after the injection. *Id.* The subsequent D&E was accomplished successfully in 23 of 24 cases; one woman hemorrhaged and had to be hospitalized without requiring a transfusion. *Id.* The study authors concluded that "transvaginal . . . intraamniotic digoxin is feasible, quick and well tolerated and successfully resulted in fetal demise in all participants who received the treatment." *Id.* at 5.

Another study reviewed 1,795 second-trimester D&Es performed after 17 weeks LMP at a facility which required induction of fetal demise by transabdominal digoxin prior to the D&E. Dkt. 35 Ex. 2. The overall failure rate for intra-amniotic injections was 31 percent; for intrafetal injections, it was 4.7 percent. *Id.* at 4. There were no failures reported for doses of 1.0 milligrams of digoxin injected intrafetally. *Id.* But only 107 patients received this maximum tested dosage; thus, the authors concluded, "further study may be warranted to identify rare, subtle or transient adverse effects . . . ." *Id.* Intra-amniotic injection is less difficult for the physician but less effective. *Id.*

Finally, one study randomized 268 women carrying pregnancies between 20 and 23 [6]/[7] weeks LMP to receive intra-amniotic or intrafetal injections of digoxin before

receiving a D&E. Katharine O. White *et al.*, *Intra-fetal Compared with Intra-amniotic Digoxin Before Dilation and Evacuation*, 128 Obstetrics & Gynecology 1071 (2016), *cited by* Davis Decl. ¶ 26–28. Excluded from the study were morbidly obese women and women on heart medications, among others. *Id.* at 1072. Both groups showed no differences in adverse events, side effects, or procedure time. *Id.* at 1074–75. The higher technical difficulty of intrafetal injection resulted in several patients randomized to intrafetal injections actually receiving intra-amniotic injections. *Id.* at 1075. The rate of failure of intra-amniotic injection was 18 percent; for intrafetal injection, it was 5 percent. *Id.* The authors acknowledged these rates to be higher than in other studies. *Id.* Seven women experienced extramural abortion, *id.* at 1076, which the authors found consistent with prior reports of digoxin injections. *Id.*

Dr. Davis reports her experience with routine digoxin administration as follows:

> In my practice, we have never routinely attempted to induce fetal demise prior to performing a standard D&E procedure. Shortly after the U.S. Supreme Court upheld the federal partial birth abortion ban, to comply with that ban, we began administering digoxin for patients at or after 18 weeks LMP where we felt an intact procedure [i.e., the procedure banned for live fetuses] was safer for patients. We administered digoxin via transabdominal intrafetal or intraamniotic injection approximately 24 hours prior to D&E. After only a few months, we abandoned the practice. Digoxin administration provided no medical benefits to our patients and was not effective in every case, and it deeply upset some patients to undergo the transabdominal procedure. During the procedure itself, some patients cried due to the pain and emotional distress of being subjected to an invasive injection.

Davis Decl. ¶ 33.

In sum, the available evidence suggests that digoxin injections before D&E carry

no clinical or technical benefits; they do not make the D&E easier for the patient or the physician. If the patient would otherwise undergo dilation and evacuation on the same day, the injection adds another full day to the total procedure time.

Neither intrafetal and intra-amniotic injections are invariably effective, and Defendants' expert concedes there is not "sufficient data" on the safety of sequential doses if the first fails, First Berry Dep. 119:16–19, though "multiple injections may be needed to successfully induce fetal asystole." Dkt. 33 Ex. 1, at 4. Intrafetal injection is highly (though not perfectly) reliable but more technically difficult; intra-amniotic injection is less difficult but also less reliable. Obesity and uterine fibroids may also make the injections difficult "or impossible." Davis Decl. ¶ 24. *See also* Ralston Decl. ¶ 17.

Some women will experience extramural abortion as a result of the digoxin; other complications, such as nausea, may attend as well. *See* Dkt. 33 Ex. 1, at 2 (summarizing "conflicting results" of studies of digoxin safety); Dkt. 40 Ex. 9, at 243 ("Extramural delivery, hospitalization, and signs of infection have also been reported as more frequent with digoxin use before D&E than with non-use.").

Finally, the evidence of patient preference is ambiguous, offering no clear support for the positions that women generally prefer or disprefer induction of demise by digoxin over no induction of demise. *See* Dkt. 33 Ex. 1, at 5 ("[T]he sparse evidence available is conflicting.").

B. *Potassium Chloride*

Potassium chloride is generally used to treat low blood potassium levels. It also is used in executions. *See Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015). Physicians such

as Dr. David Berry, M.D., (Defendants' expert) and Dr. Steven Ralston, M.D., (Dr. Bernard's expert), who are specialists in maternal-fetal medicine, use it to perform selective terminations (in a multiple pregnancy, the destruction of an abnormal fetus where the others are healthy) or fetal reductions (in a multiple pregnancy, usually in the context of assisted reproductive technology, the destruction of one or more presumably healthy fetuses to reach a preferred number). Ralston Decl. ¶ 12; Dkt. 32 Ex. 3, ¶ 5 [hereinafter Berry Decl.].

In contrast to digoxin, which may be injected intra-amniotically, KCl "must be injected into the fetal circulation." Ralston Decl. ¶ 13. In practice this means an intracardiac injection (that is, into the fetal heart) or a funic injection (that is, into the umbilical cord). Otherwise fetal demise is "not ensure[d]." *Id.* Dr. Berry avers that the KCl may also be injected into the fetal chest, trunk, or head, "whichever is more accessible." Berry Decl. ¶ 9. But Dr. Ralston observes that "intracranial KCl injections" are "not a mainstream medical practice," with "almost no data to demonstrate the[ir] efficacy or safety . . . ." Ralston Decl. ¶ 29. Dr. Berry in response cites two studies approving intracranial injections but apparently silent on intrathoracic or intra-abdominal injections. Dkt. 44 Ex. 1, ¶ 4 [hereinafter Berry Reply Decl.].

To deliver intracardiac KCl,

> a physician uses a spinal needle up to 20 centimeters in length. Under direct ultrasound visualization, the physician will insert the needle through the woman's skin, adipose tissue (fat), uterus, and amniotic sac, and then through the fetus and into the fetal heart. Once the physician confirms that the needle has reached the fetal heart, the physician injects the KCl and holds the needle in place for several minutes in case

it is necessary to inject additional KCl to achieve fetal demise.

Ralston Decl. ¶ 14.

From 2004 to 2014, British Pregnancy Advisory Service, a British nonprofit abortion provider, required inducing fetal demise with KCl prior to a D&E after certain gestational thresholds. Dkt. 40 Ex. 9, at 235. That requirement was stricken in July 2014 "following the publication of research suggesting that the risks with feticide outweigh the benefits, and the conclusion in US guidelines that there is insufficient evidence to recommend feticide to increase the safety of D&E." *Id.* The policy change afforded opportunity for a comparative study of abortion outcomes with and without KCl-induced demise. *Id.* "The primary outcomes [studied] were the duration of the D&E and 'any complication." *Id.* The study concluded "that feticide with intra-cardiac KCl is associated with a reduction in D&E procedure duration but with more reported pain, mainly at the injection site, and an increased occurrence of uterine atony[,]" the inability of the uterus to contract adequately after delivery and a major cause of postpartum hemorrhage. *Id.* at 238. The reduction in procedure duration was exceeded by the time required to deliver the injection, however. *Id.*

Other reported complications, though "rare," include chorioamnionitis, an infection of the amniotic sac, and one case of "maternal cardiac arrest due to inadvertent intravascular injection . . . ." *Id.* at 234–35. (Inducing cardiac arrest is the desired outcome when KCl is used in executions. *See Glossip*, 135 S. Ct. at 2732.) Patient discomfort, pain, or other adverse reactions may also prevent the injection from being

administered. In one study of 197 patients, "physicians had to stop the procedure before injecting the KCl in 3 cases in which the woman experienced too much discomfort, in 1 case in which the fetal position changed, and in 1 case in which the woman had a seizure after needle placement." Ralston Decl. ¶ 37 (citing Anna K. Sfakianaki *et al.*, *Potassium Chloride-Induced Fetal Demise: A Retrospective Cohort Study of Efficacy and Safety*, 33 J. Ultrasound Med. 337, 339 (2014)). As with digoxin injections, obesity or the presence of fibroids may render KCl injection contraindicated or impossible. Ralston Decl. ¶¶ 18–19.

The effectiveness of KCl, administered correctly, in causing fetal demise is not disputed. Dr. Berry concedes a 1 to 5 percent failure rate. First Berry Dep. 169:11–16. In the remaining 95 to 99 percent of cases, KCl typically induces demise in seconds or minutes, far more quickly than digoxin. Berry Decl. ¶ 10. The parties' dispute centers rather around how difficult the injections are to perform. Dr. Ralston says, Exceptionally; Dr. Berry says, Not at all. We find Dr. Ralston the more credible witness on this point.

Dr. Ralston describes the difficulty of administering a safe and effective KCl injection as follows:

> [T]he fetal heart is extremely small; early in the second trimester when physicians begin performing D&Es, it is approximately the size of a dime. Pinpointing such a precise, tiny space inside the woman's body with a long needle is difficult. Later in the second trimester, by perhaps 20–22 weeks [LMP],[3] the fetal heart is somewhat larger, but then the fetal chest wall is thicker, requiring more finesse to introduce the needle into the space. Moreover, the fetus (and, therefore, the fetal heart) is not stationary. The fetus is suspended in

---

[3] Recall that Dr. Bernard performs D&Es from 15 weeks LMP through 21 $^6/_7$ weeks LMP.

> amniotic fluid, and its position within the fluid is not static; thus, even if a physician is able to reach the fetus with the needle, the movement of the needle (and its contact with the fetus) can push the fetus away. Meanwhile, the woman's own movements can cause the fetus's position to change and disrupt the angle of approach.

Ralston Decl. ¶ 16. Funic injections are more difficult than intracardiac injections, *id.* ¶ 13 n.1; intracranial injections are less. *See* Berry Decl. ¶ 9.

In addition to his hospital practice, Dr. Ralston is a Clinical Professor of Obstetrics and Gynecology at the University of Pennsylvania medical school. Ralston Decl. ¶ 2. He has "substantial experience" training maternal-fetal medicine specialists in fetal needle procedures, including KCl injections. *Id.* ¶ 3. Dr. Ralston estimates he has trained "approximately 40" maternal-fetal medicine fellows in fetal needle procedures and an equal number of junior maternal-fetal medicine faculty who were never previously trained to perform them. *Id.* ¶ 23.

In light of that experience, Dr. Ralston describes the required training as follows:

> Training in ultrasound-based skills, including needle procedures, is scaffolded: trainees must master simple techniques, first observing, and then practicing many times under supervision, before moving on to more advanced techniques. . . . [After learning how to count and measure fetuses and identify fetal organs,] [a] few, but not most, OB/GYN residents are then able to learn the next step, which is critical for [maternal-fetal medicine] fellows.

> That next step is to orient the [ultrasound] transducer in relation to the patient's body, to the fetal position, and to the two-dimensional image on the screen. . . . [A trained maternal-fetal medicine specialist] will locate the fetus, create a three-dimensional image in his or her mind of the fetal position and orientation in relation to the woman's anatomy, and then know where to move the transducer in order to display [a desired fetal part] on the ultrasound screen. . . . The

skill of building that mental three-dimensional image takes significant time to develop, and that is one reason that [maternal-fetal medicine] fellowships last for three years.

It takes time[] to learn to do ultrasound correctly, let alone to put a needle in tiny spaces through several inches of tissue and fluid, as KCl injections require. As a physician moves the needle, it may not move in the same plane as the transducer. Developing this skill requires observing and then performing a high volume of procedures, which must occur under supervision to keep the patient safe. Even among [maternal-fetal medicine] specialists, some can master this skill, and others cannot. Most practicing [maternal-fetal medicine] specialists do not perform procedures that entail placing needles in small spaces, such as KCl injections and fetal blood transfusion.

*Id.* ¶¶ 24–26.

In view of the technical difficulty of the procedure and long training required for competence in it, Dr. Ralston rates the performance of fetal KCl injections as "an extremely advanced skill" and "outside the training and experience of the overwhelming majority of OB/Gyns and beyond the competence of many even if they were to be trained." *Id.* ¶¶ 10, 12. This is supported by other literature on the subject, *see* First Berry Dep. 202:15–22 ("'[A] relatively small number of physicians possess the requisite skills and experience'" for performing "'[t]hese technically challenging procedures . . . .'" (citation omitted)), including a study cited by Dr. Berry for the contrary proposition, *see* Ralston Dep. ¶ 35 ("'Feticide is a specialized procedure that should really be undertaken in tertiary fetal medicine units . . . .'" (citation omitted)), as well as another study cited by Defendants. Dkt. 33 Ex. 1, at 2 ("Although intracardiac KCl is highly effective, it requires additional training and a high level of ultrasonography skills and equipment.").

In contrast to Dr. Ralston, Dr. Berry had never taught anyone to perform a fetal KCl injection until some time between his May 23, 2019, deposition and May 31, 2019, supplemental declaration. *Compare* First Berry Dep. 168:16–169:1 *with* Berry Reply Decl. ¶ 9. In that week, Dr. Berry represents, he "successfully" instructed "another medical provider" how to perform intrafetal injections "on a life-like training model." Berry Reply Decl. ¶ 9. Setting aside the dubiousness of this claim (it raises among others the question of the meaning of "successfully" in this context), Dr. Berry's experience with the amount of training necessary to perform fetal KCl injections is still negligible compared with Dr. Ralston's.

The gravamen of Dr. Berry's response to Dr. Ralston is that far less care is necessary in the abortion context, "where the goal is total fetal demise," as opposed to, presumably, the contexts of selective termination and fetal reduction. Berry Reply Decl. ¶ 3. *Also id. passim*; *id.* ¶¶ 4, 8. Dr. Berry appears to distinguish "ending the entire pregnancy" from ending only part of it. *Id.* ¶ 4. But Dr. Berry does not elaborate on this distinction or why in respects relevant here it permits less precision in the former context. Selectively "terminated" or "reduced" fetuses are destroyed by Dr. Berry's KCl injections just as a fetus would be destroyed by the same KCl injection prior to a D&E. That one or more fetuses are not destroyed in the former context—that, as to this fetus or these fetuses, the goal is "fetal preservation," *id.* ¶ 3—does not alter the fact that "fetal demise" is the goal as to one or more terminated or reduced fetuses. The cost of error is high in either case, no matter whether error risks the health and safety of the pregnant woman only or additionally the health and safety of one or more fetuses sought to be preserved.

Dr. Berry avers further that a D&E is little less complicated than a KCl injection, *id.* ¶ 5, and that any physician who can perform a D&E can be taught to perform safe KCl injections. But Dr. Ralston's personal experiences refute this position. *See* Ralston Decl. ¶ 26.

### C. *Umbilical Cord Transection*

Transecting the umbilical cord induces fetal demise by exsanguination (that is, the fetus bleeds to death). First Francis Dep. 54:12–20. It is performed after dilation just prior to evacuation, once the laminaria or other dilators have been removed and the amniotic sac has been punctured. Dkt. 33 Ex. 1, at 3.

This method of causing demise is profoundly understudied; the retrospective case series submitted by Defendants "is the only study on cord transection to induce fetal demise in the entirety of the world's medical literature." Davis Reply Decl. ¶ 28. *See* Dkt. 33 Ex. 1 (study). Nonetheless, at least two abortion providers in the country have routinely induced fetal demise by this method since passage of the federal "partial birth" abortion ban. *See* Dkt. 33 Ex. 1; Dkt. 33, at 3 (study of intra-amniotic digoxin conducted in setting where transection was "standard procedure" in attempt to avoid federal criminal liability).

The safety, difficulty, or effectiveness of transection in causing fetal demise are not greatly disputed. The study cited by Defendants found transection "to be a feasible, efficacious and safe way to induce fetal demise without performing additional procedures [such as digoxin or KCl injections] that may have an unfavorable risk-benefit ratio." Dkt. 33 Ex. 1, at 5. Dr. Bernard does not dispute this finding, though Dr. Davis emphasizes

that a retrospective case series is a "low-quality form of medical evidence" which does not without more justify alteration of medical practice, Davis Reply Decl. ¶ 28, and the study authors themselves caution of "a potential lack of generalizability" of their results in light of the study design. Dkt. 33 Ex. 1, at 5.

Rather, the parties' chief dispute centers around whether transection is a feasible means of complying with HEA 1211. The only record evidence suggests that it is not possible for the physician performing the transection to be satisfied that she is not also thereby severing other fetal tissue.

Dr. Davis explains,

> [P]articularly at 15–16 weeks, when many D&E abortions occur, the umbilical cord is like a limp piece of yarn. In order to access the cord and fetus prior to a D&E, the amniotic sac must be opened. After the fluid drains, the uterus contracts and the fetus, placenta, and cord become one mass. I have witnessed this on many occasions using intra-operative ultrasound and there is no way to visualize the umbilical cord separately from fetal tissue after amniotic fluid is released. Further, the cord cannot be sensed with forceps or other equipment. Locating and transecting the cord under these circumstances without also withdrawing fetal tissue is impossible to ensure. . . . [A]fter release of amniotic fluid ultrasound cannot be used to guide an instrument to access and distinctly grasp the cord. Therefore, a physician who attempts to access the umbilical cord has no assurance that she will be able to do so because the cord is not distinct.

Davis Reply Decl. ¶ 29.

Dr. Davis avers further that she has personally communicated with one of the authors of the transection study, who represented to Dr. Davis that the study "did not purport to address the feasibility of transecting the cord separately from the fetal tissue."

Davis Decl. ¶ 41. The author agreed "that it would be difficult-to-impossible to reliably transect the cord separately from the fetus, particularly at early gestational stages." *Id.*

## V. Plaintiff's Lawsuit and the Instant Motion

Dr. Bernard filed this lawsuit under 42 U.S.C. § 1983 on April 25, 2019. Dkt. 1. As defendants, she named the members of Indiana's Medical Licensing Board, "the body that licenses and disciplines physicians in Indiana[,]" Compl. ¶ 8, in their official capacities, as well as the Marion County prosecuting attorney in his official capacity. (As indicated above, the only physicians performing covered procedures and thus at risk of prosecution are located in Indianapolis, Marion County.) The instant motion for a preliminary injunction was filed the following day, April 26, 2019. Dkt. 6. We heard oral argument on Dr. Bernard's motion on June 3, 2019. Dkt. 45. Unless enjoined, HEA 1211 will become effective July 1, 2019.

## Standard of Decision

"'A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest.'" *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

At the threshold, a plaintiff seeking a preliminary injunction must show a better than negligible likelihood of success on the merits and irreparable harm. *Girl Scouts of Manitou Council, Inc. v. Girls Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citations omitted); *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024 (S.D. Ind. 2014)

(citations omitted).

If this showing is made, the court, "attempt[ing] to minimize the cost of potential error," must then balance the private and public equities on a sliding scale to determine whether the injunction should issue. *Id.* That is, "'the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards [her] side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards [her] side.'" *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (*quoting Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013)). The plaintiff's burden with respect to injunctive relief is proof by a preponderance of the evidence. *Baskin*, 983 F. Supp. 2d at 1024.

## Analysis

Most constitutional injury is presumed irreparable, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014), with here-irrelevant exceptions for constitutional torts sufficiently analogous to common-law personal-injury claims. *See Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004). And for patients "who lose the opportunity to exercise their constitutional right to an abortion, the irreparability of the harm is clear." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018), *petition for cert. filed* (Feb. 4, 2019).

We proceed, therefore, to (I) Dr. Bernard's likelihood of success before turning to (II) the remaining injunction factors.

## I.  Likelihood of Success on the Merits

Dr. Bernard claims that HEA 1211 (A) constitutes an undue burden on her patients' right to seek a previability abortion and (B) impinges on their right to bodily integrity, all in violation of the Due Process Clause of the Fourteenth Amendment, prohibiting a state from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1, cl. 3.

### A.  *Undue Burden*

Among the liberties protected by the Due Process Clause is freedom from state-imposed motherhood. *Roe v. Wade*, 410 U.S. 113, 152–53 (1973). In part, that liberty is protected from state deprivation without due process of law by guaranteeing a pregnant woman's choice to terminate her pregnancy before fetal viability without undue state interference. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) (maj. op.).

Without exception, "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879 (joint. op. of O'Connor, Kennedy, Souter, JJ.[4] [hereinafter joint op.]). Further, a provision of law imposes "an 'undue burden' on a woman's right to decide to have an abortion, and consequently . . . is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016)

---

[4] The joint opinion constitutes the holding of the *Casey* Court in relevant part under *Marks v. United States*, 430 U.S. 188, 193–94 (1977).

(emphasis omitted) (quoting *Casey*, 505 U.S. at 878 (joint op.)).

"The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. The benefits of a law are measured against the state's legitimate interests in this field and in comparison to those derived from prior law. *Id.* at 2311. First, "[a]s with any medical procedure, the State may enact regulations to further the health and safety of a woman seeking an abortion." *Casey*, 505 U.S. at 878 (joint op.). But "'unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right'" to seek a previability abortion. *Hellerstedt*, 136 S. Ct. at 2300 (alteration omitted) (quoting *Casey*, 505 U.S. at 878 (joint op.)).

Second, the state has a legitimate interest in preserving life that may one day become a human being. *Casey*, 505 U.S. at 878 (joint op.). To promote that interest, the state may enact measures to ensure the woman's choice is philosophically and socially informed and to communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872 (joint op.). But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877 (joint op.).

Third, the state may choose to further the same interest by enacting measures "'protecting the integrity and ethics of the medical profession' . . . in order to promote respect for life[.]" *Gonzales v. Carhart*, 550 U.S. 124, 158 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)). The state may also "'create [other] structural

mechanism[s] by which [it] . . . express[es] profound respect for the life of the unborn,'"
*id.* at 146 (quoting *Casey*, 505 U.S. at 877 (joint op.)), but such measures equally may not
impose undue burdens. *Id.* at 158.

The burdens of a law are measured by their impacts on the women for whom they
are a relevant restriction on the choice to seek a previability abortion. *Hellerstedt*, 136 S.
Ct. at 2313; *Casey*, 505 U.S. at 895. "The proper focus of constitutional inquiry is the
group for whom the law is a restriction, not the group for whom the law is irrelevant."
*Casey*, 505 U.S. at 895. If the impacts amount to a substantial obstacle to the abortion
decision for a "large fraction" of that group, the burdens imposed are undue. *Hellerstedt*,
136 S. Ct. at 2313; *Casey*, 505 U.S. at 895.

Against the backdrop of these principles, the court then turns to

> its ultimate task of determining whether the burdens of the
> law's requirements were "disproportionate, in their effect on
> the right to an abortion" compared "to the benefits that the
> restrictions are believed to confer." To determine whether a
> burden is undue, the court must "weigh the burdens against
> the state's justification, asking whether and to what extent the
> challenged regulation actually advances the state's interests.
> If a burden significantly exceeds what is necessary to advance
> the state's interests, it is 'undue,'" and thus unconstitutional.

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896
F.3d 809, 827 (7th Cir. 2018) (quoting *Planned Parenthood of Wis., Inc. v. Schimel*, 806
F.3d 908, 919 (7th Cir. 2015)), *petition for cert. filed* (Feb. 4, 2019). It is Defendants'
burden to show that the state has not imposed an undue burden on the previability
abortion right. *See Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (citing
*District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008); *United States v. Carolene*

*Prods. Co.*, 304 U.S. 144, 154 n.4 (1938)).

We begin with (1) the state's interest in enacting HEA 1211, next considering (2) the burden on women seeking previability abortions imposed by HEA 1211 before (3) balancing the benefits and burdens as described above.

1.  Indiana's Interests

Defendants assert first that HEA 1211 "protects the dignity and value of fetal life" from the "brutality" and "inhumanity" of D&E, specifically the "brutality" and "inhumanity" inherent in the disarticulation or dismemberment of the fetus as it is evacuated from the uterus. Br. Opp. 12–13. But HEA 1211 does not save fetuses from dismemberment per se. It saves fetuses from dismemberment "through clamps, grasping forceps, tongs, scissors, or another similar instrument that, through the convergence of two (2) rigid levers, slices, crushes, or grasps a portion of the fetus's body to cut or rip it off." HEA 1211 expressly does not save any fetus from dismemberment by "suction" of "fetal parts into a collection container." It is difficult to see how any respect for life is even arguably expressed by the choice to ban dismemberment by the convergence of two rigid levers while permitting dismemberment by suction.

Defendants meekly refer to "evidence that a fetus may react to painful stimuli" by 20 weeks LMP, Br. Opp. 12, after aspiration has ceased to be an effective abortion method, but wisely do not press the point too far. As explained above, "a widespread consensus exists in the medical and scientific community that fetal pain is not possible before at least 24 weeks LMP[,]" that is, before the third trimester. Ralston Decl. ¶ 49. The "equat[ion] [of] pain [with] reflexes" is "in contradiction to the accepted, medical

definition of pain as a subjective, psychological experience" and an "outlier view . . . ." *Id.* ¶ 46. Absent a capacity in the previability fetus to perceive pain, Defendants' comparisons of the D&E procedure to drawing and quartering, for example, cannot be accorded any weight. Br. Opp. 15.

There is the lurid spectacle of the fetal parts being extracted from the patient and reassembled by the physician "to ensure everything has been removed." Francis Decl. ¶ 12. "But *all* abortion procedures, and indeed a vast number of surgical procedures unrelated to the reproductive process, including forms of cosmetic surgery that strike many people as frivolous, are bloody and horrible." *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 470 (7th Cir. 1998). "The constitutional right to an abortion carries with it the right to perform medical procedures that many people find distasteful or worse." *Id.* at 471.

Nonetheless, the *Gonzales* Court took it as self-evident that "for many, D & E is a procedure itself laden with the power to devalue human life." 550 U.S. at 158. We are bound by that judgment as establishing a legitimate state concern for such potential devaluation as inheres in the D&E procedure. But Defendants' own evidence, the only record evidence on the point, suggests that physicians performing D&E are acutely aware of, not insensible to, the moral valences of their actions:

> Dutifully, I went through the task of reassembling the fetal parts in the metal tray. It is an odd ritual that abortion providers perform—required as a clinical safety measure to ensure that nothing is left behind in the uterus to cause a complication—but it also permits us in an odd way to pay respect to the fetus (feelings of awe are not uncommon when looking at miniature fingers and fingernails, heart, intestines,

> kidneys, adrenal glands), even as we simultaneously have
> complete disregard for it.

Dkt. 30 Ex. 2, at 6. *See also* Dkt. 31, at 6 ("Some part of our cultural and perhaps even

biological heritage recoils at a destructive operation on a form that is similar to our own,

even though we know that the act has a positive effect for a living person. No one who

has not performed D & E can know what it is like or what it means; but having performed

it, we are bewildered by the possibilities of interpretation."). Absent from Defendants'

submissions is any evidence that the provision of D&E in Indiana by physicians like Dr.

Bernard and Dr. Meng has in any way coarsened or cheapened the attitudes of Hoosiers

towards human life.

    *Gonzales* also established as legitimate a paternalistic concern for a woman's

regret upon coming to learn the violent details of the "intact D&E" procedure proscribed

by the challenged statute. Given the Court's observation on the standard D&E procedure

recited above, this interest is presumably applicable to that procedure, as Defendants

argue. Br. Opp. 14.

    *Gonzales* held that "[i]t is a reasonable inference that a necessary effect [of the

intact D&E ban] and the knowledge [of the procedure's gruesomeness] it conveys will be

to encourage some women to carry the infant to full term[.]" 550 U.S. at 160. But a

prohibition can only be said to be "calculated to inform the woman's free choice, not

hinder it[,]" *Casey*, 505 U.S. at 877 (joint op.), if a genuine (that is, a not unduly

burdened) choice survives imposition of the prohibition. In *Gonzales*, that choice

survived in the woman's freedom to choose the standard D&E procedure for a second-

trimester, previability abortion, which the challenged statute, the Court held, relying in part on the canon of constitutional avoidance, did not prohibit. 550 U.S. at 153–54. Here, by contrast, as discussed further below in relation to the proffered alternatives to standard D&E without prior demise, the only available alternatives are unduly burdensome.

Defendants are thus left with defending the line "between abortion and infanticide." Br. Opp. 15. In *Gonzales*, Congress had found that the "intact D&E" procedure proscribed by the challenged statute "had a 'disturbing similarity to the killing of a newborn infant,' and thus it was concerned with 'drawing a bright line that clearly distinguishes abortion and infanticide." 550 U.S. at 158 (citations, alteration brackets omitted). No such legislative findings (in fact, no legislative findings of any description) are present in this case, nor is any other evidence that D&E in fact tends to blur the line between abortion and infanticide.

Also unlike *Gonzales*, Defendants have made no showing, as Congress *mutatis mutandis* had rationally found, "that [dismemberment by lever-convergence], more than [dismemberment by suction], 'undermines the public's perception of the appropriate role of a physician during the delivery process[.]'" *Id.* at 160 (citation omitted). *Gonzales* distinguished "intact" D&E as nearer to infanticide than ordinary D&E in that "the former occurs when the fetus is partially outside the mother," *id.*, "just inches before completion of the birth process." *Id.* at 157. No such point of distinction is apparent in this case as between prohibited and permitted dismemberments, nor as between D&E without prior demise versus any other method of second trimester abortion.

Defendants assert second, and relatedly, that HEA 1211 "protects the integrity of the medical profession by ensuring that doctors do not participate in such a brutal and inhumane procedure." Br. Opp. 13. The considerations discussed above apply here as well. Defendants suggest further that "a woman who later discovers that her doctor whom she trusted ripped her child apart limb-from-limb may lose faith in the medical profession." Br. Opp. 14. This is entirely speculative; there is not a shred of evidence for this proposition. More is required of Defendants to discharge their burden here. Moreover, as Dr. Bernard points out, Defendants have failed entirely to address the converse, which strikes us at least as probable: that a patient will lose faith in the medical profession when she discovers that she will be denied a procedure (D&E), or subjected to additional procedures (fetal-demise procedures), for no medical reason whatsoever but rather for reasons of pure paternalism. Reply Br. 7.

Defendants assert third and finally that HEA 1211 "represents an important step towards not only more humane treatment of the fetus, but also greater care for the mental health of the woman choosing abortion." Br. Opp. 15. In support of this argument, Defendants cite the work of Dr. Priscilla K. Coleman, Ph.D., a psychologist who has long contended, in the face of severe and so far unremitting methodological criticism, that abortion causes mental health problems in the women who receive them. *See Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 908 (8th Cir. 2018) (Murphy, J., dissenting) ("The majority [though relying on and citing Dr. Coleman approvingly] concedes that there is no proof in the medical literature that abortion causes suicide, and it recognizes that an advisory telling a woman that abortion causes an increased risk of

suicide would be untruthful."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 273 F. Supp. 3d 1013, 1036 (S.D. Ind. 2017) (Pratt, J.), *aff'd*, 896 F.3d 809 (7th Cir. 2018); Allison Orr Larsen, *Constitutional Law in an Age of Alternative Facts*, 93 N.Y.U.L. Rev. 175, 204–05 & nn.158–60 (2018).

We need not wade in those murky waters here, however, as the incidence of adverse mental health outcomes following abortion *vel non* cannot speak to the incidence of adverse mental health outcomes following D&E without inducing prior demise versus any other particular method of second trimester abortion. As Dr. Bernard concludes, therefore, Dr. Coleman's opinions "are simply not relevant." Reply Br. 7.

In sum, the state interests advanced by Defendants in support of HEA 1211 are legitimate state interests under *Casey* and *Gonzales*. But Defendants have not shown a rational relation between those cited interests, on the one hand, and the types of dismemberment HEA 1211 does and does not prohibit, on the other. Nor have Defendants shown a rational relation between those interests, on the one hand, and the methods of second trimester abortion HEA 1211 does and does not prohibit, on the other, with the exception of the inherent potential for devaluation identified in *Gonzales*. To the extent such rational relations exist, Defendants have not shown that HEA 1211, based on the record before us, appreciably and in fact advances those interests.

2. Burdens on the Abortion Right

In prohibiting standard D&E, HEA 1211 unquestionably imposes substantial burdens on the right of women in Indiana to seek previability abortions in the second trimester.

(a) A woman receiving an induction abortion because standard D&E is prohibited is burdened as follows. She must exchange an outpatient procedure taking place over two relatively brief periods (or else over one period, if she is early enough in her term to be dilated and evacuated on the same day), likely measured in minutes, for an inpatient procedure which may extend over a grueling two or three days. She must undergo all the physical and emotional rigors and pains of labor, or be rendered insensate for the same period. She must pay an additional $10,000 or more, likely at least in part out of her own pocket. She is significantly more likely to experience retained products of conception or incomplete abortion and to be forced to undergo additional procedures accordingly. She must put herself at risk of uterine rupture. She is highly likely to have preferred D&E and likely to experience greater emotional distress from the induction.

(b) A woman receiving a hysterotomy because standard D&E is prohibited faces burdens nearly unimaginable. She would undergo major, exceptionally invasive surgery at much greater risk to herself in a context where no physician could recommend that she do so.

(c) A woman receiving a D&E after fetal demise has been induced by injections either of digoxin or of KCl because standard D&E is prohibited is burdened as follows. She is subjected to additional painful invasions and additional medical risks without additional medical benefits. She is subjected to a procedure which only a minority of physicians are trained to perform and/or currently employ, and then for nonmedical reasons. If she seeks an abortion early enough in the second trimester, she is subjected to a procedure which no physicians currently employ, so far as appears from the record.

Finally, when, as will invariably occur, induction of demise fails, she will necessarily be subjected to either induction of labor or hysterotomy, and the attendant burdens outlined above.

(c)(i) A woman receiving a D&E after fetal demise has been induced by digoxin because standard D&E is prohibited is burdened as follows. If she is early enough in her term to be dilated on the same day as the evacuation, she must add an additional day to the procedure time. If she seeks an abortion before 17 weeks LMP, she is subjected to a procedure for which there is no scientific medical authority. If she is obese or suffers from uterine fibroids, the procedure may be entirely unavailable to her or substantially more difficult for her. She risks failure rates ranging from around 4 to around 30 percent, followed either by subsequent injections unstudied for their safety, or else by one of the other second-trimester alternatives outlined above. She is more likely to experience vomiting, hospitalization, and extramural delivery. If she does not experience extramural delivery, she is made to carry a demised fetus until the following day.

(c)(ii) A woman receiving a D&E after fetal demise has been induced by KCl because standard D&E is prohibited is burdened as follows. For the present and foreseeable future, she is highly unlikely to be able to obtain the abortion at all because no physicians in Indiana are currently trained to perform them. Even if such training were available, it would take a substantial interval of time to acquire the necessary competence, during which interval the procedure will remain unavailable; the requisite competence may never be acquired at all. Assuming such training were available and effective, she may still find the procedure unavailable to her because it cannot be

completed for reasons of discomfort, obesity, the presence of fibroids, change of fetal position, or seizure. She risks uterine atony or cardiac arrest. She risks failure rates ranging from 1 to 5 percent, followed either by subsequent injections unstudied for their safety, or else by one of the other second-trimester alternatives outlined above.

(d) Finally, under HEA 1211, a woman cannot have fetal demise induced by umbilical cord transection. HEA 1211 proscribes "knowingly or intentionally" performing a "dismemberment abortion." "'A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so.'" *Hawkins v. State*, 748 N.E.2d 362, 363 (Ind. 2001) (quoting Ind. Code § 35-41-2-2(b)).

The only relevant record evidence before us is that two physicians agree "it would be difficult-to-impossible to reliably transect the cord separately from the [fetal tissue], particularly at early gestational stages." Davis Decl. ¶ 41. Dr. Davis's explanation for this difficulty-to-impossibility is persuasive and unrebutted. Accordingly, we presume other physicians operate under the same conception, such that a physician preparing to undertake cord transection would be aware of a high probability of simultaneously though unintentionally transecting other fetal parts as well, resulting in a "living fetus" being "extracted one (1) piece at a time from the uterus" in violation of HEA 1211. *Compare Gonzales*, 550 U.S. at 155 ("The evidence . . . supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance.").

Even if a woman could have fetal demise induced by transection under HEA 1211, she would have to submit herself to a practically unstudied procedure and its attendant

medical risks without any additional medical benefit.

### 3. Balance of Benefits and Burdens

In *Stenberg v. Carhart*, 530 U.S. 914 (2000), the Supreme Court struck down a Nebraska statute which prohibited both standard D&E as well as intact D&E "for at least two independent reasons." *Id.* at 930. First, the law lacked an exception for preserving the health of the mother. *Id.* HEA 1211 does contain such an exception, so that much of *Stenberg* is inapplicable here. Second, the law imposed an undue burden on a woman's ability "to choose a D & E abortion, thereby unduly burdening the right to choose abortion itself." *Id.*

Nebraska conceded "that the statute imposes an 'undue burden' if it applies to the more commonly used D & E procedure as well as to" intact D&E. *Id.* at 938. Thus, the Court's undue-burden analysis began and ended with the question of whether the law covered standard D&E in addition to intact D&E, which the Court answered affirmatively. *Id.* The Court concluded, "[U]sing [the challenged statute] some [prosecutors] may choose to pursue physicians who use D & E procedures, the most commonly used method for performing previability abortions. . . . The result is an undue burden upon a woman's right to make an abortion decision." *Id.* at 945–46. Justice O'Connor, author of the *Casey* joint opinion, concurred, opining that, "[i]f there were adequate alternative methods for a woman safely to obtain an abortion before viability, it is unlikely that prohibiting the [intact] procedure alone would amount in practical terms to a substantial obstacle to a woman seeking an abortion." *Id.* at 951 (O'Connor, J., concurring). But because the law "proscribes not only the [intact] procedure but also the

[standard] procedure, the most commonly used method for previability second trimester abortions," the law constituted "an undue burden on a woman's right to terminate her pregnancy." *Id.* (citation and quotation marks omitted).

Similarly, *Gonzales* came to the Court with the government's concession that the challenged statute "would impose an undue burden if it covered standard D & E" in addition to the intact procedure. 550 U.S. at 147. The Court thus asked "whether [the statute] imposes an undue burden, as a facial matter, because its restrictions on second-trimester abortions are too broad." *Id.* at 150. The Court concluded the burdens were not undue because the statute "prohibits intact D & E[,] and, notwithstanding respondents' arguments, it does not prohibit the [standard] D & E procedure . . . ." *Id.* The Court grounded that conclusion on the text of the statute, and buttressed it by invoking the canon of constitutional avoidance, whereby "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* at 153 (citation and quotation marks omitted). Naturally, application of this canon was appropriate only if the Court agreed with the government that reading the statute to ban standard D&E would render it unconstitutional.

In light of *Stenberg* and *Gonzales*, HEA 1211 comes before us with a heavy presumption of unconstitutionality. *Cf. Whole Woman's Health v. Paxton*, 280 F. Supp. 3d 938, 945 (W.D. Tex. 2017) ("This court need look no further. . . . [T]he Act has the undisputed effect of banning the standard D & E procedure when performed before fetal demise. Presented with the Supreme Court's determinations in *Stenberg* and *Gonzale*[*s*]—that laws with the effect of banning the standard D & E procedure result in

an undue burden upon a woman's right to have an abortion and are therefore unconstitutional—the court concludes, based on existing precedent alone, the Act must fail."). We find it unlikely that Defendants' arguments will be able to overcome it. They have been unable to show that, in the absence of standard D&E, the right of women in Indiana to seek second-trimester previability abortions is not unduly burdened in light of the state interests asserted.

Specifically, we hold that none of the proffered alternatives serve as an adequate substitute for the standard D&E procedure. *Compare Gonzales*, 550 U.S. at 164–65 ("Alternatives are available to the prohibited procedure. As we have noted, the Act does not proscribe D & E. . . . Here the [challenged law] allows, among other means, a commonly used and generally accepted method, so it does not construct a substantial obstacle to the abortion right."). The proffered alternatives subject women to increased risk of physical, psychological, and economic harm for no medical benefit. They variously increase the cost of the procedure, the duration and pain of the procedure, the medical risks of the procedure, or all three. To many women, the alternatives are simply unavailable, for the several reasons described above.

Every federal court to have considered the issue has reached the same ultimate conclusion as to the fetal demise methods proposed here. *West Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1324 (11th Cir. 2018) (affirming permanent injunction) (sustaining district court's findings that state's proposed fetal demise methods were not safe, effective, and available), *cert. denied*, 2019 WL 2649821 (June 28, 2019); *EMW Women's Surgical Ctr. v. Meier*, 373 F. Supp. 3d 807, 823 (W.D. Ky. 2019) (entering

permanent injunction) ("[T]he proposed fetal-demise methods are not feasible for inducing fetal-demise before standard D&E . . . ."), *appeal filed* (May 15, 2019); *Planned Parenthood Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 867 (S.D. Ohio 2019) (entering preliminary injunction) ("Each of the State's suggested demise options have serious drawbacks, that vary depending on the gestational age and size of the fetus."); *Paxton*, 280 F. Supp. 3d at 953 (entering permanent injunction) ("The court concludes that requiring a woman to undergo an unwanted, risky, invasive, and experimental procedure in exchange for exercising her right to choose an abortion, substantially burdens that right."), *appeal filed* (Dec. 1, 2017); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024 (E.D. Ark. 2017) (entering preliminary injunction) ("[T]he Court concludes that on the current record these proposed methods are not feasible for inducing fetal demise before the standard D & E procedure [plaintiff doctor] and other Arkansas abortion providers perform.").

Notably, fewer courts have been asked to consider the adequacy of induction or hysterotomy as alternatives to D&E, but the uniform conclusion is that they are no alternatives at all. *Yost*, 375 F. Supp. 3d at 856; *Paxton*, 280 F. Supp. 3d at 948; *Hopkins*, 267 F.3d at 1068.

The women for whom the restrictions of HEA 1211 are relevant are women in Indiana who, but for HEA 1211, would receive a standard D&E. *See EMW*, 373 F. Supp. 3d at 824; *Paxton*, 280 F. Supp. 3d at 952; *Hopkins*, 267 F. Supp. 3d at 1067. We conclude that, for a large fraction of these women—perhaps most or even all—HEA 1211 imposes a substantial obstacle to their exercise of the previability abortion right by

prohibiting the most common, safest, and best understood method of second trimester

abortion in exchange for alternatives that are riskier, more costly, less reliable, more

painful, and in some instances simply unavailable. The benefits extend, at most, to a

marginal or merely rational advancement of some (though not all) of the state interests

asserted. The burdens of HEA 1211 very substantially exceed its benefits, are therefore

undue, and are highly likely to render HEA 1211 unconstitutional.

Dr. Bernard has shown a better than negligible chance of success on the merits of

her undue-burden claim.

B. *Right to Bodily Integrity*

Among the liberties protected by the Due Process Clause, in addition to the

previability abortion right, is a more generalized "liberty interest in bodily integrity."

*Twyman v. Burton*, 757 F. Supp. 2d 804, 809 (S.D. Ind. 2010) (Pratt, J.) (citing *Albright*

*v. Oliver*, 510 U.S. 266, 272 (1994); *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir.

1997)). In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833

(1992), the Court characterized the previability abortion right as "stand[ing] at an

intersection of two lines of decisions," implicating both "the liberty relating to intimate

relationships, the family, and decisions about whether or not to beget or bear a child[,]"

as well as the liberty "of personal autonomy and bodily integrity, with doctrinal affinity

to cases recognizing limits on governmental power to mandate medical treatment or to

bar its rejection." *Id.* at 857.

Here, Dr. Bernard argues,

If in a context other than abortion the State prohibited a safe,

> reliable, easy and minimally invasive surgical procedure and instead required Hoosiers to undergo procedures that were not feasible to resolve the underlying problem and that were untested, potentially painful and dangerous, and served no medical purpose, the constitutional challenge would undoubtedly be swift.

Br. Supp. 25. Undoubtedly it would. But this case, of course, does arise in the context of the abortion right, which *Casey* characterized as a subset or offshoot of the more general bodily-integrity right. Dr. Bernard makes no argument that the Supreme Court's bodily-integrity jurisprudence affords protections which its abortion cases do not; indeed, she suggests the contrary, arguing that "the same fundamental right" is at issue on these facts under either body of law. Br. Supp. 26. We have recently rejected efforts to test violations of the abortion right under a standard other than the undue-burden standard. *See Whole Woman's Health Alliance v. Hill*, No. 1:18-cv-01904-SEB-MJD, 2019 WL 2329381, *25 (S.D. Ind. May 31, 2019) (Barker, J.).

Accordingly, at this preliminary stage, without any developed argument as to whether, why, or how a bodily-integrity claim would differ from an undue-burden claim, we conclude Dr. Bernard has shown no better than a negligible chance of success on the merits of her bodily-integrity claim.

## II. Remaining Injunction Factors

Having found irreparable injury and likelihood of success on the merits, we turn now to balancing the injunction factors.

The predominant factor in the case before us is Dr. Bernard's likelihood of success on the merits. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of*

*Health*, 896 F.3d 809, 816 (7th Cir. 2018), *petition for cert. filed* (Feb. 4, 2019); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). In light of the unanimous judgment of the federal courts who have addressed and resolved virtually the same question, we find Dr. Bernard has shown an exceptionally high likelihood of success on her undue-burden claim.

The irreparable harm to women who lose the opportunity to exercise the previability abortion right is severe, as we have explained here and elsewhere. *See Whole Woman's Health Alliance v. Hill*, No. 1:18-cv-01904-SEB-MJD, 2019 WL 2329381, *32 (S.D. Ind. May 31, 2019) (Barker, J.). By contrast, vis-à-vis Defendants, an injunction would do no more than maintain the status quo that has prevailed in Indiana in the four decades since *Roe*.

The public interest to be equitably balanced in Defendants' favor is usually coextensive with any governmental interest appearing in the merits analysis. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789 (7th Cir. 2011); *United States v. Rural Elec. Convenience Coop.*, 922 F.2d 429, 440 (7th Cir. 1991). We have found that interest here to be slight. Because injunctions enforcing the Constitution are in the public interest, Defendants' interests are at best secondary. *See Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

Accordingly, we hold that the balance of equities favors Dr. Bernard.

## Conclusion and Order

HEA 1211 prohibits physicians from utilizing the most common, safest, often most cost effective, and best understood method of second trimester abortion, requiring

instead resort to alternatives that are medically riskier, more costly, less reliable, and in some instances simply unavailable, while accomplishing little more than expressing hostility towards the constitutionally fundamental right of women to control their own reproductive lives as established in *Roe*.

For this reason and the others given above:

Plaintiff's motion for a preliminary injunction is GRANTED.

Defendants are PRELIMINARILY ENJOINED from enforcing HEA 1211, Act of April 24, 2019, Pub. L. 93-2019, 2019 Ind. Legis. Serv. P.L. 93-2019 (West), prohibiting the knowing or intentional performance of a "dismemberment abortion" as defined therein. NO BOND is required of Plaintiff.

IT IS SO ORDERED.

Date: _____6/28/2019_____          _Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Christopher Michael Anderson
INDIANA ATTORNEY GENERAL
christopher.anderson@atg.in.gov

Andrew Beck
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
abeck@aclu.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas M. Fisher
INDIANA ATTORNEY GENERAL
tom.fisher@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Diana Lynn Moers Davis
INDIANA ATTORNEY GENERAL
diana.moers@atg.in.gov

Julia Catherine Payne
INDIANA OFFICE OF THE ATTORNEY GENERAL
Julia.Payne@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org