UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|                                      |   |                     |
|--------------------------------------|---|---------------------|
| CAITLIN BERNARD, M.D.,               | ) |                     |
| KATHERINE McHUGH, M.D.,              | ) |                     |
|                                      | ) |                     |
| Plaintiffs,                          | ) | CAUSE NO.:          |
|                                      | ) | 1:19-cv-1660-SEB/DML |
|                                      | ) | Indianapolis, Indiana |
| -v-                                  | ) | **June 3rd, 2019**  |
|                                      | ) | 10:15 a.m.          |
| THE INDIVIDUAL MEMBERS OF THE        | ) |                     |
| INDIANA MEDICAL LICENSING BOARD,     | ) |                     |
| In Their Official Capacities;        | ) |                     |
| THE MARION COUNTY PROSECUTOR,        | ) |                     |
|                                      | ) |                     |
| Defendants.                          | ) |                     |

**Before the Honorable**
**SARAH EVANS BARKER, JUDGE**

OFFICIAL REPORTER'S TRANSCRIPT OF
PRELIMINARY INJUNCTION HEARING

**Court Reporter:**          Laura Howie-Walters, FCRR/RPR/CSR
                             Official Court Reporter
                             United States District Court
                             Room 217
                             46 East Ohio Street
                             Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

# A P P E A R A N C E S

**For Plaintiffs:**                    Kenneth J. Falk, Esq.
                                       Gavin Rose, Esq.
                                       ACLU OF INDIANA
                                       1031 E. Washington Street
                                       Indianapolis, IN  46202

                                                and

                                       Andrew Beck
                                       AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION
                                       125 Broad Street, 18th Floor
                                       New York, NY  10004


**For Defendants:**                    Thomas M. Fisher, Esq.
                                       Julia Payne, Esq.
                                       Diana Moers Davis, Esq.
                                       Christopher Anderson, Esq.
                                       INDIANA ATTORNEY GENERAL
                                       302 West Washington Street
                                       Indiana Government Center South
                                       Fifth Floor
                                       Indianapolis, IN  46204

(Open court.)

THE COURT:  Morning, all.

MR. FALK:  Morning, Judge.

MR. FISHER:  Morning, Your Honor.

THE COURT:  And I guess I do mean all.  We don't usually have quite so many people in our gallery, but it's nice to see that much interest.  It's always nice to have you lawyers here, regular attendees in federal district court. It's nice to see you this morning.  You may be seated.

MR. FALK:  Thank you.

THE COURT:  Ms. Harves, will you call the matter before the Court and we'll get underway.

(Call to order of the Court)

Okay, this matter's on the Court's calendar today for a hearing on the plaintiff's request for preliminary injunctive relief.  The state filed a request, a motion for leave to file supplemental declarations late on Friday.

Do you have any objection to that, Mr. Falk?

MR. FALK:  No, Your Honor.

THE COURT:  Okay.  So we'll grant that request, that motion for leave.

MR. FISHER:  Thank you, Your Honor.

THE COURT:  I don't know of anything procedurally that we need to tie up before we get into the substance.  Do you know of anything, Mr. Falk?

MR. FALK:  No, Your Honor.

THE COURT:  Or Mr. Fisher?

MR. FISHER:  Nothing, Your Honor.

THE COURT:  Okay, fine.

So I have reviewed, of course, carefully the submissions.  I can't say as I've read through all 608 pages of exhibits, or maybe those are numbered exhibits, and similarly impressive number from the State, but I have read all of the briefs and have a pretty clear understanding of what's at issue here.

So I would like to use the time to exchange some questions and have you answer them for me so I make sure I have a clear understanding.  And you can assume that I have in mind the parameters of your position, and the authorities that you rely on for those positions.  We'll be able to use the time efficiently, I think, if we do it that way.

So Mr. Falk, are you arguing today?

MR. FALK:  Yes, I am, Your Honor.

THE COURT:  All right.  And you, Mr. Fisher for the State?

MR. FISHER:  Yes, Your Honor.

THE COURT:  Okay.  Again, welcome.  Welcome to all of who you are back a little bit farther as well.  Nice to have you.

Mr. Falk, good morning, sir.

MR. FALK:  Thank you, Your Honor.  Good morning.

Before I begin, Mr. Fisher and I have discussed this as we have before prior hearings, and it's our understanding that all the documents that we have filed in this case are before you for purposes of the preliminary injunction.  I will not move them into evidence because you have them already, but we did both provide you with binders that I think have all those documents in them.

THE COURT:  All right.  And so are they stipulated for purposes of the hearing?

MR. FALK:  Yes, for you to give them whatever weight you feel is appropriate.

MR. FISHER:  Agreed, Your Honor.

THE COURT:  All right.  Thank you, Mr. Fisher.

MR. FALK:  Your Honor, it's agreed to that the primary method of abortion after early in the second trimester is through the standard D&E, dilation and evacuation.

THE COURT:  Do you read the statute that's been enacted to impose a statutory ban on that standard D&E procedure?

MR. FALK:  Yes, absent what the statute describes as necessary to prevent death or serious risk of substantial and irreversible impairment of a bodily function, and that's how that statute -- this is similar to what's been enacted in at least five other states -- that's how it's been consistently

interpreted -- banning the method that is used most frequently for abortions after early in the second trimester.

THE COURT:  Do you know of any litigation on this issue that has not banned -- the banning of the procedure who has not found it to be unconstitutional?

MR. FALK:  No, Your Honor.  All five federal cases have entered injunctions.  The Ohio case is a partial injunction, but nevertheless, found that plaintiffs will likely succeed in demonstrating that the statute's unconstitutional. I should say some of the other cases are preliminary injunctions, so they were obviously preliminary injunction findings.

THE COURT:  Has the Kentucky District Court ruled yet?

MR. FALK:  Yes, the Kentucky District Court entered a final judgment in early May, which we cite in our materials finding that yes, indeed it was unconstitutional and an undue burden.

THE COURT:  Okay.

MR. FALK:  Those cases -- some of those cases are on appeal.  There's one case that is pending review on an application for certiorari, but they have unanimously found that the statutes are unconstitutional.

THE COURT:  Is this procedure uniformly -- that means throughout the legal discussions that have occurred -- referred to as dismemberment abortion?

MR. FALK:  No, Your Honor.  I think the evidence from our plaintiff, Dr. Bernard, from Dr. Mong, who's the only other doctor in Indiana doing D&Es, from Dr. Davis, and the case law itself all indicate that this is not a medical term.  This is a term that obviously catches headlines, but this is not a medical term at all.

THE COURT:  Okay.  Does the D&E procedure get applied most often in the second trimester, but also the first trimester; is that true?

MR. FALK:  No, it is solely a second trimester.  In the first trimester, the fetal tissue is small enough that the D&C or the aspiration abortion is a possibility and will occur.  In fact, at the very beginning of the second trimester, it is possible at times for aspiration to occur, but after about 15 weeks, then D&E is what's being used.

So it is certainly the predominant method throughout the United States in the second trimester, after that very early part of the second trimester.  And of course --

THE COURT:  Go ahead.  I didn't mean to pepper you with questions quite so early, but I wanted to get those issues out there.

MR. FALK:  Thank you.

Of course after July 1st, without an injunction, it will be illegal to do that, and what this means is that there are women in Indiana who will simply not be able to obtain

abortions.  This is certainly an undue burden.

And as we note and as we discussed, we're not necessarily writing on a clean slate here.  The point is that not only have other district courts and one Court of Appeals found the virtually identical statute unconstitutional, but the Supreme Court has told us that banning the principal method for second trimester abortions is also unconstitutional.

In Stenberg in 2000, the law attempted to ban what was called partial birth abortions, a relatively rare, late abortion method.  It was struck down because the Supreme Court found it also would have banned D&Es, which the Supreme Court termed "the mostly commonly used method for performing previability second trimester abortions."

In 2007, when the federal Partial Birth Abortion Act was upheld in Gonzalez, the Court again stressed that this act, unlike the predecessor, was not going to make unlawful the normal, traditional D&E, which is allowed to occur because it's so common.

We are not arguing, as the State suggests, that these precedents enshrine an abortion method as constitutionally sacrosanct, but what these cases make clear is it's not up to the court to engage in the scientific or medical analysis, and to determine what abortion method is best.

Instead, if an abortion method is in general usage in a large majority of cases, as everyone agrees D&E is --

THE COURT:  Does everybody agree to that?

MR. FALK:  Yes, Your Honor.  I don't think there's any disagreement.  Dr. Bernard testified that the majority of abortions she performs are D&Es, and certainly the statistic is given that nationwide it's 95 percent.  I think the State argues that perhaps that is high, but no one disagrees that D&E is the majority method used for second trimester abortions.

THE COURT:  So the alternatives that have been proposed in support of the legislation, the enactment, are the exception, not the rule.  And they are the exception for reasons that I know in the record have been medically downgraded, that is to say, they are not as efficacious; is that true?

MR. FALK:  Yes, and I should note, jumping to that, I mean the State's position is we have an important state interest here and we disagree with that.  And the State says in any event, there are other safe, effective, available alternatives, and therefore --

THE COURT:  What is the State interest?

MR. FALK:  Well, the state is claiming three interests.  The State is claiming we are interested in preventing mental health issues that may develop with women who have the D&E.  And for this, they introduced evidence from Dr. Coleman that -- who has studied this and made a lifetime of trying to demonstrate some connection, authoritative studies,

disagree.  The consensus opinion is there is no mental health link, but most importantly for our purpose, neither Dr. Coleman nor the State, point to any studies that purport to show some increase in mental health issues with women who get a second trimester D&E as opposed to women who get an abortion from some other method in the second trimester.  So the mental health issue really, I think, is a nonstarter.

          The State spends time talking about pain, that we're trying to minimize fetal pain, but again, the consensus opinion, has we noted from Dr. Ralston, is that a fetus cannot feel pain till at least 24 weeks because prior to that time, the cerebral cortex has not developed, and that is what science says is necessary.

          But in any event, the State doesn't explain why a D&E might be painful but not a two to three-day induction abortion or a 24-hour attempted abortion through digoxin.  Again, I think the pain issue is a non-starter.

          THE COURT:  That argument is focused on fetal pain as opposed to maternal pain, right?

          MR. FALK:  Yes, yes.  And despite the fact that the State argues a woman can get some sort of pain medicine, the idea being labor -- in labor for two to three days, I suspect, is something that women who have gone through labor would say is not --

          THE COURT:  I might even take judicial notice of that.

MR. FALK:  Well, thank you, Your Honor.  I've heard secondhand is all I can say.

THE COURT:  It's reliable.

MR. FALK:  The third interest the State posits is this notion of the integrity of the medical profession, but the State ignores the real ethical problem here for it does not attempt to controvert Dr. Bernard and Dr. Davis' contentions that denying the woman the ability to obtain a D&E, and forcing them to undergo or to forego an abortion all together, or undergo painful, risk-enhancing procedures with no medical benefits, violates medical ethics.

Do not harm.  They are going to be required to do harm to their patients, but I think the state concedes that unless they --

THE COURT:  Well, the physicians' duties stated more broadly basically is to give the best possible care to a patient.

MR. FALK:  Yes.

THE COURT:  And if the best possible care is not available because of legal enactments, then there's the ethical dilemma, right?

MR. FALK:  Yes, and I think the case law has recognized that as a dilemma that this law will put doctors in.

THE COURT:  Do you know of any other medical procedures that are regarded by physicians generally -- not

even generally, but in a wide scale way to be safe and reliable and easily implemented, minimally invasive and so forth, that are outlawed?

     MR. FALK:  No.

     THE COURT:  Is abortion sui generis here?

     MR. FALK:  Yes, yes, not properly so I would argue, but yes.  I do not think that there's any other situation where a doctor is told:  "You have patient X.  You can do this procedure, but I'm not going to allow you to do it.  You may not be able to do it at all, or you can do something that may that not work, may cause pain, may cause very harmful side effects.  You have to do it that way."

     I think doctors would walk away from that because obviously it cuts against everything the doctors learn and what they are sworn to do.

     THE COURT:  So in terms of legal controls that preempt the medical judgment, abortion is unique; is that your understanding?

     MR. FALK:  The General Assembly is attempting to make abortion unique, correct, to the detriment of patients.

     The State concedes that no matter how strong its interest is, it cannot prevail if, in fact, there is no safe, effective, available alternative.  And the State posits four potential alternatives, but I think we have to focus on the facts here.

The facts are there are only two doctors in Indiana performing D&Es today, and there will only be two performing D&Es on June 30th, Dr. Bernard and Dr. Mong.

Neither of them are trained to use digoxin. Neither of them have gone through the intensive training necessary to use KCL, potassium chloride. Neither of them have been trained in what has the experimental procedure --

THE COURT: What does it mean that there are only two? Out of all the OB/GYNs?

MR. FALK: That's correct. And I should note that a part of that, I think, is because in Indiana, unlike many states, D&Es have to take place in the hospital. D&Es are regarded as so safe and so minimally invasive that in many states, they're done in clinics. In Indiana, they're done in hospitals. And I should also note that there's a policy that covers both Dr. Mong and Dr. Bernard that D&Es are only done when there is serious or fatal fetal anomaly or serious health problems of the woman or in cases of rape. So it's a very narrow set that is being done here.

The only alternative --

THE COURT: Whose policy is that?

MR. FALK: It's a policy that was described as binding IU Health, it is a policy that --

THE COURT: Is it a standard of care for OB/GYNs?

MR. FALK: I believe so. Actually, and I apologize,

we did see -- there was a third-party production request and
there was a policy produced.  It basically tracks what I just
said.  It has to be for cause.  I think it's more general.

        THE COURT:  If there are only two people doing them?

        MR. FALK:  That's correct.

        THE COURT:  Yes.

        MR. FALK:  And there's no controversy as to that.

        THE COURT:  Okay.

        MR. FALK:  Only two doctors doing D&Es.

        So when we're talking about July 1st, which obviously
isn't very far away, realistically, the only potential
alternative to a D&E is induction, where a woman must go
through induced labor to deliver a deceased fetus.

        The first problem completely ignored by the State is
that because induction can require a two to three-day hospital
stay, it is much more expensive than a D&E, even the D&Es in
Indiana which are done in hospital.  And Dr. Bernard indicated
in her declaration that, without contravention, that the cost
of the induction is beyond the financial capacity of many of
her patients.  They simply will not be able to get the
abortion.

        Even aside from that issue of cost, which cost itself
can obviously be an undue burden, even aside from that,
induction is not feasible for a number of reasons.  The D&E,
the actual D&E takes -- could take ten to 15 minutes.  It

simply is not feasible, reasonable, available, effective, to force a woman to undergo a two to three-day hospitalization and a recovery period as opposed to the D&E.

THE COURT:  From which other complications can occur?

MR. FALK:  Of course.  And in one of those complications, a significant percentage of the cases -- and there's a disagreement in the materials, the low is 8.1, the high is much higher, but even defendants admit that there is retained placenta frequently, and you have to go back in to surgery for that.

In fact, Dr. Mong, in his deposition, said 40 percent of the inductions that he knows of you have to go back in for a second surgical procedure.  It's additional cost, additional discomfort, additional risk of complications.

THE COURT:  Is the patient under an anesthetic for that?

MR. FALK:  Could be, I believe, yes.

THE COURT:  That's what I understood.

MR. FALK:  There's a risk of uterine rupture.  It's not a large risk, but defendants admit and materials demonstrate it's certainly there.  And I don't know if most significantly, but significantly inductions fail.

There's one study at docket 32.1 that the State introduced that there is a seven percent failure rate.  Well now, if a woman wants to do an induction --

THE COURT:  What happens then?

MR. FALK:  Well, now what happens is you get a D&E.
So what the State says as well, "No problem.  If it fails, we
can give her a hysterotomy."  Well, hysterotomy is surgery.
It's a slitting open of the abdomen and the uterus akin to a
hysterectomy.

It's beyond understanding to argue that a hysterotomy
and all that entails is somehow an equal alternative to a
15-minute D&E, but that's what the State is left to argue
because of the deficiencies in the induction process.

The American College of Obstetricians and
Gynecologists, 40-11 F26 noted that the D&E is safe and
effective and has advantages over termination by medical
abortion.  At document 31-1 at 4, a document that the State
introduced, the Society of Family Planning noted that the
adverse effects are lower for a D&E than induction.

Docket 32, again a State document, D&E is safe and
effective.  Not surprisingly, the majority of Dr. Bernard's
patients choose D&E over induction.  So the State says "Okay,
there are other potential ways.  There are fetal demise
procedures."  The State relies extensively in its arguments
concerning the fetal demise methods on Dr. Coleman and studies
that Dr. Coleman collected.

THE COURT:  Yes, I'm familiar with her testimony and
the controversy that surrounds her testimony.  So you don't

need to dwell on that.

MR. FALK:  And I do not mean to dwell on the controversy concerning mental health.  I just want to point out to the Court, as we do in our brief, that Dr. Coleman, in two weeks before she submitted her declaration, or two weeks and a day before, had never researched fetal demise issues, in what we say is a focused systematic way.

In two weeks, she and nonphysicians collected reports and studies and attempted to render an opinion, and we would again urge, as we way in a footnote in our memo, we've got a nondoctor giving medical opinions on a subject she's never examined.

THE COURT:  A psychologist?

MR. FALK:  Yes.

THE COURT:  Yes, I know.  There's a lot of weaknesses in her testimony.  So don't dwell on that.

MR. FALK:  I will not.  The first fetal demise method is digoxin.  Digoxin's a heart medicine that if injected in the fetus or amniotic sac may, and I emphasize "may" cause fetal demise.

The previous cases that we cite, the District Court cases and the Court of Appeals cases, all uniformly recognize numerous problems with digoxin as a method for substituting for the D&E.

First, there's no -- virtually no data whatsoever

discussing the use of digoxin before 18 weeks.  Half of
Dr. Bernard's abortions are at 18 weeks or less.  There's no
medical justification for prolonging the pregnancy in order to
use anything.  Obviously risks of abortion are very minimal,
but those risks go up the later you are.  So it makes no sense
to tell someone "Well, it's too early for us to do this because
it's experimental.  Go ahead and wait."  Although Dr. Berry
hypothesized that digoxin can be used earlier, he conceded that
there are no studies demonstrating this and he's never done it.

Second, administering digoxin can be difficult, if not
contraindicated, for women who are obese, who have fibroids or
other uterine anomalies.  Again, Dr. Berry sought to minimize
this and said, "Well, it's no problem" --

THE COURT:  It's a very complex procedure to
administer, isn't it, at least the way it's being proposed?

MR. FALK:  Yes, it is.  And Dr. Ralston notes how
difficult --

THE COURT:  Like a moon landing.  You've got to get it
A-okay every single time.

MR. FALK:  You do.  And obviously there's at least one
report where it was not A-okay, and the woman went into heart
failure.  Luckily she was able to be revived, but if you inject
in the wrong area, and that's talking about the KCL, which
we'll get to.  So there's a difficulty for some women in
actually getting the digoxin.

Third, it frequently doesn't work.  The White study, which we cite, which is at 20 to 24 weeks when the fetus is much larger than earlier on obviously, 20 percent failure rate if it's intra-amniotic and a 7 rate when they were trying to get within the fetus, but they weren't able to do so.  They missed 17 percent of the time.

THE COURT:  I know the weakness of legislative history, but just let me ask, was all of this vetted during the debate on this legislation?  Was this being made as a medical judgment as well as a political judgment?

MR. FALK:  I was not involved in the legislative process, and I cannot speak as to everything they were told.  I do know that my client, Dr. Bernard, testified before the legislature, so they certainly had someone available to tell them this.

THE COURT:  Before a committee?

MR. FALK:  I think it was before -- it must have been before the committee, yes, Your Honor, I apologize.  And I know -- I think Mr. Fisher might have given a statement, too, so maybe he can address that.  I just do not know.

THE COURT:  Okay.  Well, it seems like it's very sophisticated medical science, and that it's the sort of thing that legislatures, as well as courts, have to rely on experts.

MR. FALK:  Yes, yes, and I think -- I think the problem is that this does go significantly off the track from

the very beginning because as I said, the Supreme Court has said if there's a dominant method for abortion, it's an undue burden to prohibit it, which I think to me indicates that the Supreme Court is saying "Look, don't get involved in the medical judgment of what's best or what's not.  Allow doctors to develop their standard practice."  What is the standard practice?  Well, the standard practice, after early in the second trimester for abortions, is the D&E.

So the problem, of course, with digoxin is it doesn't work in a significant percentage of cases.  So what do you do?  There is no medical research supporting the --

THE COURT:  Is this medication digoxin produced for this purpose?

MR. FALK:  No.

THE COURT:  Is this an off label, as they say, use?

MR. FALK:  I assume so.  Again, this is not something I know, but I do know it's a heart medicine.  So I assume -- I do not know if there's anything on the label for this purpose.

But if it doesn't work, there's no research to support doing multiple injections.  So what do you do?  Well, obviously if it doesn't work, you do a standard D&E, but you can't do that come July 1st.

There are risks to digoxin --

THE COURT:  What would you do?  How does that play out?

MR. FALK:  I do not know.  I do not know because the law --

THE COURT:  Will those procedures have impaired the viability of the fetus or the pregnancy only to have them fail and not have an option available?

MR. FALK:  I think it's quite possible, at least according to studies.  I know in a significant percentage of cases, they just won't work.  I do not know what it will do to the fetus, but it will not result in demise of the fetus.  And then you're at the situation of do we do multiple injections, which hasn't been proven, which of course every injection increases the rate of infection, the rate of adverse effects.  And one of those adverse affects, including infection, is extramural delivery, which is a delivery unplanned, spontaneous.  Dr. Berry --

THE COURT:  Which often is accompanied by hemorrhaging?

MR. FALK:  Yes, and Dr. Berry poo poos this saying "What's the big deal?  The woman wants to have an abortion anyway."  Well, if you're driving home after being told to come back in 24 hours to see if the digoxin works, and you start to hemorrhage, it is a big deal, and it's a recognized side effect.

As I alluded to, digoxin can take 24 hours to work.  So if you're going to use digoxin, you're now going to make the

period of time to get an abortion in Indiana stretch to three

days, because on day one, at least 18 hours before getting the

digoxin, beginning the abortion, you have to get the

proposed -- the informed consent notice.  That's required by

Indiana law.

        Then you go back for the digoxin the next day.  You

leave, and assuming you don't have extramural delivery or other

problems, you return.  So now we're talking about a three-day

problem -- time period, which is problematic for many reasons.

        The State argues that women prefer fetal demise

through digoxin, but they cite a study where the women were

told or thought it would make the abortion easier or less

painful.  And of course these are potentially very painful.

We're talking about shots going through the abdomen, into the

uterus.  The authors of that study said you should interpret

results cautiously, and in a subsequent study, when offered the

option of digoxin, 81 percent of the women declined.

        THE COURT:  Is the state of medical training such that

OB/GYNs can perform these alternate methods?  Have they been

trained to do them?

        MR. FALK:  No.  Both Dr. Bernard and Dr. Mong

testified that they cannot do the injections.  Now, certainly

digoxin is easier than KCL because with digoxin, you can go

intra-amniotic.  KCL, potassium chloride, requires, to be

efficacious, that you go into the heart, the fetal heart, which

at this point may be the size of a dime or less.

Dr. Berry opines that you can also go into the cranium or the thorax.  He cites in his rebuttal declaration, he cites articles concerning intracranial for pregnancy reduction, which occurs much earlier in the pregnancy, with a much lower dose and lower risk of harm as Dr. Ralston notes.  And Dr. Ralston further notes that without contravention, intracranial is not practiced, studied or taught in the U.S.

So when we talk about using potassium chloride to get to fetal demise, we're talking about trying to put the needle into the fetal heart.  This requires a high degree of skill, and it's typically performed only after specialized fellowship with a lot of training.

THE COURT:  But which has not been provided, I mean --

MR. FALK:  It has not.

THE COURT:  The state of the art is not there.

MR. FALK:  It has not been provided to Dr. Mong.

THE COURT:  To say to a woman that she can't get the standard D&E procedure, and she has to avail herself of these other offerings that are not available either because the physicians have not been trained to do them, and/or are not doing them, then she's left with no recourse; is that true?

MR. FALK:  That is absolutely correct.  Neither Dr. Bernard or Dr. Mong have been trained, and Dr. Bernard indicates that she's not of anywhere -- not aware of anyone who

can teach her.  Remember, Dr. Bernard is a professor at the medical school.  It's not like she doesn't have people around her, but there's no one to provide this training.

Now the State's response from Dr. Berry is "No problem.  This is simple to train.  I could do it for you in a day or a weekend."  But he conceded in his recent deposition that he's never trained anyone to perform the injections to competence.  He's never published anything about training and was forced to concede there's nothing in the medical literature to support his claim.  In fact, the literature indicates directly contrary.  This is hard stuff.

THE COURT:  And compared to the risks and the difficulty of these alternate proceedings, or procedures I should say, I read, I think -- well, it would have been one of your briefs, that the complications with a D&E are de minimis, one percent or something like that?

MR. FALK:  Yes, yes.  The D&E is by far the safest, easiest of these procedures.  KCL is at the other end.  Now Dr. Berry in his rebuttal --

THE COURT:  The General Assembly said that -- took the safest one off the table --

MR. FALK:  Yes.

THE COURT:  -- for these particular patients, this category, and said that they have to incur risks and pain --

MR. FALK:  Yes.

THE COURT:  -- and inconvenience --

MR. FALK:  Yes.

THE COURT:  -- et cetera.

MR. FALK:  Yes, although -- and really, what the legislature is saying is you have to get an induction because there's no one in Indiana to provide the other methods.  And, of course, it's impossible to balance in some equal way a potential two to three induction of late day induction of labor with the ease and simplicity and the low risk of the D&E.

Now Dr. Berry says in his rebuttal declaration that he has recently trained someone to use potassium chloride intra-amniotically and intra-fetally on a training model.  He didn't mention this in his deposition, which was two weeks ago, but he's not claiming he trained this person to competence. He's not claiming that he trained them to do it intra-cardiacly, which is the only way it's going to work.

In any event, using a model is much different than the hands on real patient training that Dr. Ralston notes is required.  Dr. Ralston, the head of obstetrics and gynecology at Pennsylvania Hospital, a clinical professor of medicine, has tried to teach people over the years how to do these type of injections.

And he indicated that some doctors, even though they have gone through advanced residency, et cetera, simply cannot do it.  It's just too hard.

Dr. Bernard testified in her deposition that while she was in medical school -- excuse me, in a fellowship, she did participate in or assisted or observed fetal demise, and she knows enough about it to know how difficult it is and that she cannot do it.  She does not have the competency to do it.

THE COURT:  I assume it's like these alternate procedures are like most medical procedures, and that is, you can't say in advance whether it's going to be effective?

MR. FALK:  Yes, yes.  And you certainly can't say in advance if you're going to meet some sort of uterine anomaly or scar tissue, Dr. Ralston talks about, that makes it that much harder, that alters what you're trying to look at.  What you're basically doing as I understand it --

THE COURT:  You mean like uterine fibroids or something like that?

MR. FALK:  Yes.  What you're basically doing is you're trying to visualize the three dimensions of the uterus and the fetus with a two-dimensional ultrasound aiming for a spot which might not be visible.  There is movement of the woman's body.  There's movement of the fluid.  There's movement of the fetus.  It's extremely hard, and --

THE COURT:  Is that true for the procedure that requires the severing of the umbilical cord?

MR. FALK:  Yes.  The severing of the umbilical cord, the umbilical cord transection, raises a whole other problem.

For one thing, that's completely experimental.  It's not done as an alternative to D&E, and it certainly cannot be done to satisfy the statute, because the problem with the umbilical transection is, as I understand it -- you know, I'm not a doctor -- but as I understand it, you have to open up, get the amniotic fluid out, you pierce the placenta.  Once that fluid drains, everything inside the uterus becomes one mass.

And so at that point, you can't visualize with ultrasound.  You certainly can't feel anything with a medical instrument.  You have to go in blind.  And there's -- the chance of going in blind and cutting the umbilical cord, which Dr. Davis tells us at that point might be like a wet piece of yarn, and not cutting other fetal tissue, is minimal.

So any doctor going in at that point must know that he is likely to cut fetal tissue.  The minute she cuts fetal tissue, she's committing a felony.

THE COURT:  That's what's prohibited by the statute.

MR. FALK:  It's completely prohibited, and you can't say that you have to have intent, because every doctor knows that once you pierce that, and the fluid flows out, you are going to be likely getting fetal tissue.  You're likely to violate the law.  That's all that's necessary for a prosecutor to say you're violating the law.

The KCL, there is a risk obviously.  There's nausea, there's pain, there a uterine atony, which is a serious, if not

fatal, problem; rare, but possible.

And of course, as I noted, there's that reported case where there was cardiac arrest, because if you inject into the woman's circulatory system, blood system, that poison is going to go to her.

THE COURT:  Could I ask you, please, to address your argument about the woman's right to bodily integrity?

MR. FALK:  Yes, Your Honor.

THE COURT:  Because then I need to have you wrap it up so that I can hear from Mr. Fisher.

MR. FALK:  Thank you.

At its most basic, due process safeguards a right to bodily integrity.  The State is insisting here on induction or fetal demise; it forces women who want to get an abortion, which the State is not conceding -- the State is not arguing is not constitutionally protected, clearly, to get this constitutional right to obtain a pre-viability abortion.  It forces women to allow intrusions into their body they do not want.

The State is saying "Sure, you can get an abortion, but you must avoid the safest and least obtrusive method.  You must consent to the methods that we have dictated, the way that we are going to want to intrude on to your body."

The methods are not medically indicated.  They provide no medical benefit.  They're more risky.  They're more painful.

They're more invasive.  They're more expensive.

In addition to being an undue burden, it violates bodily integrity --

THE COURT:  It restricts her choice with respect to the procedures that she would yield to in having a constitutionally-protected abortion.

MR. FALK:  Yes, but it not only restricts the choice, but it's the State dictating if you want to exercise that choice, this is how you have to allow your body to be invaded, and as you alluded to --

THE COURT:  That's what I meant by restrict the choice.

MR. FALK:  As you alluded to, that's unprecedented. For these reasons, the statute is clearly unconstitutional.  We obviously meet the other standards for granting preliminary injunction and one should issue.

THE COURT:  Thank you, Mr. Falk.

MR. FALK:  Thank you.

THE COURT:  Mr. Fisher.

MR. FISHER:  Thank you, Your Honor.

May it please the Court.

THE COURT:  Mr. Fisher.

MR. FISHER:  The State seeks to ban a procedure that entails ripping a live fetus limb from limb from the mother's womb while it slowly bleeds to death.  This is very similar to

the partial birth abortion procedure --

       THE COURT:  Wait a minute.  Any description, any verbal description of what is entailed in any abortion has its unsavory aspects.  So I'm not going to let you load this up with a lot of language, because we're talking about a very technical, medical issue, a very technical legal issue.  So don't do that.  That will just cause me to have to come back and say stop that.  So let's talk about the lawsuit and not the politics.

       MR. FISHER:  I don't want to talk about the politics.

       THE COURT:  Well, you started out that way, so that's why I said what I said.

       MR. FISHER:  That description comes from Gonzalez.  I don't need to repeat it, but the reason I refer to it is that that is the sort of description that the Supreme Court used when talking about how states are justified in regulating abortion procedures by reference to the impact on the fetus, even when the fetus -- even when there's --

       THE COURT:  Did you agree, Mr. Fisher, that this statute that was enacted by the General Assembly is contrary to the weight of law in this area, both under the Supreme Court and the Seventh Circuit and other states?

       MR. FISHER:  Not Seventh Circuit.  Not the Supreme Court.  Certainly other states, what has happened to other state dismemberment laws, yes.  I think there is no case that

has come out our way.  They've all come out the plaintiffs'
way.

THE COURT:  Right.  So the current state of the law is
against this approach; is that true?

MR. FALK:  I don't think there is a state of the law
in this circuit.

THE COURT:  Well, taking the legal precedents and the
statements that have been made, the Seventh Circuit case was
decided after Gonzalez back on remand, wasn't it?

MR. FISHER:  After Stenberg.

THE COURT:  Right, that's it, Stenberg.  And that held
that a ban applying to the D&E procedure was unconstitutional.

MR. FISHER:  It was conceded by the states, just as it
had been --

THE COURT:  That's the holding.

MR. FISHER:  Well --

THE COURT:  You can't say it's in your favor.

MR. FISHER:  It did me a favor?  No, it didn't do me a
favor.  I think --

THE COURT:  No, I said it's not in your favor.

MR. FISHER:  No, certainly not in my favor.  It is --
but I think just as the Court, the Supreme Court in Stenberg
was dealing with a concession by the state of Nebraska, and
therefore did not reach a square holding on what would happen
if a state were to --

THE COURT:  Well, listen, the question I was trying to put out there is that there's no legal authority that's in effect that supports the formulation that was taken in this statute currently; isn't that true?

MR. FISHER:  If by that -- if I may, I just want to make sure I understand the question.  There is -- I don't know of any case, I think there is no case that specifically addresses a D&E statute.

THE COURT:  That's my point.  So "yes" is the answer to my question.

MR. FISHER:  Except --

THE COURT:  "Yes" is the answer to my question.

All right.  And I want to ask you this:  Do you agree that the D&E procedure is the standard, the best practice, the currently efficacious medical procedure for dealing with a second trimester abortion?

MR. FISHER:  With respect to second trimester abortions, I agree it is the majority procedure that's in use.

THE COURT:  By far?

MR. FISHER:  From what I know, yes.

THE COURT:  Yes.  I mean "by far" meaning statistically most, because we only have two doctors who know anything about how to do it in Indiana.

MR. FISHER:  True, although I do want to point out they both offer induction equally.  They both absolutely offer

induction to every patient.

        THE COURT:  But the standard procedure that's currently in effect for most second trimester abortions is the D&E, right?

        MR. FISHER:  As far as I know.

        THE COURT:  So the effect of this statute would be to take that off the table; is that right?

        MR. FISHER:  Except in cases where the life or health of the mother is at stake.

        THE COURT:  Right.  We're going to put that over there and we always talk about that.  I'm saying where that is not implicated --

        MR. FISHER:  May I make one clarification?

        THE COURT:  Wait just a minute.  Where that's not implicated, the D&E is no longer available to second trimester abortion patients; is that true?

        MR. FISHER:  Yes, but with one clarification if I may, which is to stay it is a live fetus D&E.  Going back to the alternatives is if one can cause fetal demise preceding the D&E, then the D&E can happen.  I just want to make sure that that's clear.

        THE COURT:  So yes, the statute would take that procedure out of a doctor's set of options for dealing with a patient who seeks a second trimester abortion.

        MR. FISHER:  That's correct.

THE COURT:  And in its place, the state, I assume, has assumed that there would be the alternate procedures that you have laid out, ones that Mr. Falk just ran through, too; is that right?

MR. FISHER:  Correct.

THE COURT:  None of which is, according to medical opinion, as safe; is that true?

MR. FISHER:  I think with respect to induction, I don't think that the science tells us, in terms of complications, that either D&E or induction is more or less likely to have complications.

THE COURT:  Okay.  So none of these are safer than the D&E, right?

MR. FISHER:  I don't know of any study that says that.

THE COURT:  And none of them are less time consuming and therefore less costly, true?

MR. FISHER:  No, I think that, in fact, with respect to a KCL injection, I think we're talking about minimal added time.  Of course you still have the time to do the D&E itself following fetal demise, but the fetal demise, if the KCL injection is into the heart, it is very quick.  It's a matter of minutes, if not seconds.

THE COURT:  So what you're saying is that only in looking at all the alternatives as a group would you be able to say that, as a group, they're not safer or as safe or cost

effective or discomforting, uncomfortable, et cetera?

      MR. FISHER:  I don't think we have evidence about comfort.  Let me just start there.  Certainly --

      THE COURT:  Well, three days in the hospital in labor is worse than 15 minutes of this procedure.

      MR. FISHER:  Understood.

      THE COURT:  You would stipulate to that?

      MR. FISHER:  Yes, I would.

      THE COURT:  Otherwise get Mrs. Fisher on the line.

      MR. FISHER:  Please, no.  That said, I want to make two points if I may, one of which is both Dr. Bernard and her colleague offer induction.  They must think that that is something that is a safe effective alternative, something that should be in -- something that -- an option that the patient consider.

      THE COURT:  In a minority of cases, right?

      MR. FISHER:  No, all -- in terms of offering, they always offer it.  In the minority of cases I think is what the patients choose, but I'm only saying from -- in terms of what the physicians themselves are comfortable offering.  And also Dr. Francis talks about how that is something that happens when there is some sort of maternal fetal problem, or they need to induce -- or they need to terminate the pregnancy for the reasons of health of the mother and her practice.

      THE COURT:  Well, the induction can take a long time.

MR. FISHER:  Yes.

THE COURT:  Sometimes days, right?

MR. FISHER:  Yes.

THE COURT:  So during that period of time, the pain ebbs and flows, but it is continuous during that time, right?

MR. FISHER:  I think -- I think what Dr. Francis reminds us is that in a situation where the objective is not to deliver a live birth, the pain medication available to the patient is more substantial.  There's a better opportunity to control and manage the pain.

THE COURT:  So actually, the pain medication could be a risk, right --

MR. FISHER:  Well, and --

THE COURT:  -- as with any medication?

MR. FISHER:  As with any medication, and there's anesthesia and medication associated with the D&E as well.

THE COURT:  So when you have somebody who's undergoing a day's long labor proceeding, then there's the possibility for greater complications, and then it might not actually yield the desired result, true?

MR. FISHER:  Well, I think on efficacy, there is some margin there, but I do want to go back on the complications again to reminded the Court that the studies we have cited, and indeed the ACOG study cited by the plaintiffs, come to the conclusion that there really is no difference,

complication-wise, between the D&E and the induction.

But in terms of efficacy, I understand, there is evidence that shows that the induction may not always be effective.

THE COURT:  So when the induction doesn't work, what's the doctor to do because the doctor can't then do a D&E.

MR. FISHER:  A couple of points.  I think in this -- Your Honor referred to these as a group, and I think in some ways that is an instructive way to think about it.  You have different solutions for different patients that come in and present different problems.  And one of the points that Dr. Berry makes is that there's always a solution for a given problem that the patient might present.

So you might start with induction.  You might then proceed to one of the fetal demise techniques.  And, you know, you're narrowing, narrowing, narrowing the chances that one of these is not going to work.  And ultimately, Dr. Berry says "Yes, if necessary, in some very small sliver of cases, if a hysterotomy is the only way to accomplish it, that is available.

THE COURT:  But it's not available if there are the penalties that are written into this statute?

MR. FISHER:  A hysterotomy?

THE COURT:  No, for the D&E.

MR. FISHER:  For the D&E, right.

THE COURT:  The hysterotomy, my goodness, that hardly seems like a solution to this problem.  That seems like a terrible intrusion, painful, life affecting in terms of future child bearing and so forth.  That's like saying how about amputation as a solution to varicose vanes.  Maybe not, Mr. Fisher.

MR. FISHER:  Well, I think, Your Honor, hysterotomy is not comparable to amputations.  It's -- certainly it's the same as a Caesarian section.  So those do happen.

THE COURT:  And that affects the potential child bearing in the future.

MR. FISHER:  Understood.

THE COURT:  So I mean it seems radical to me.

MR. FISHER:  Certainly not --

THE COURT:  Not a solution where there's a one percent risk attached to it, such as the D&E.

MR. FISHER:  No, and far from the first alternative. We're talking about a very narrow sliver of cases where that might be necessary after all the other options.

THE COURT:  When you're talking about induction and it goes wrong, and the alternatives, and you still can't use a D&E procedure to deal with that, it gets -- it involves these highly risky, as in difficult, challenging, perhaps not efficacious procedures, not efficacious because they can't be done by anybody effectively, and the situation for the mother,

the host, is still in need of medical attention but the one

thing that she could access is no longer available to her,

right?

        MR. FISHER:  Well --

        THE COURT:  The D&E?

        MR. FISHER:  The D&E is no longer, but I would point

out, things can go wrong with D&Es as well.  Things can always

go wrong with medical procedures.

        THE COURT:  That doesn't exactly respond to the point.

Can you answer my question about whether this decision by the

General Assembly turned on a medical judgment?  I mean, did

they have access to medical knowledge and data and so forth?

There seems to be very little data except with respect to D&Es.

        MR. FISHER:  Right.  Well, I was present for one of

the hearings.

        THE COURT:  Did you testify?

        MR. FISHER:  I did.

        THE COURT:  In favor of the bill?

        MR. FISHER:  Well, I stood up to defend the -- that it

was constitutionally defensible.  But at that hearing,

Dr. Francis testified about the alternatives, and I think

Dr. Bernard was there.  And there were a few other doctors that

testified on the other side.  Now, I didn't keep detailed notes

about the level of detail that any of the witnesses went into.

I was not present for the testimony in the house.

THE COURT:  So I know the weakness of legislative
history.  I'm just trying to decide how this happened.  So was
the legislation written with respect to the medical procedures
that the medical licensing board has to implement?  That's
who's the defendant here.  So how did they tell the medical
licensing board what they were supposed to do?

MR. FISHER:  Well, I think -- I'm not sure if I
understand the question, but the medical licensing board is --

THE COURT:  Just make it off limits?

MR. FISHER:  Yeah.

THE COURT:  That's easy.  Anybody could write that
law, right?  It seems they did.

MR. FISHER:  Yeah, it seems they did. I hope that
helps.  I don't know if that's what you were after.

THE COURT:  So do you think that the methods of
causing fetal demise are safe, effective and available
alternatives?

MR. FISHER:  Yes.

THE COURT:  Well, that's a hard position to maintain.

MR. FISHER:  I understand.

THE COURT:  Okay.  Do you think that induced labor is
a safe, effective and available alternative to D&E?

MR. FISHER:  Yes, indeed, and indeed the plaintiff
offers that to all patients.

THE COURT:  But in terms of it being an alternative to

the D&E, that's a hard position for you to maintain.

   MR. FISHER:  Well, it is what the plaintiff herself offers her patients.  It's what Dr. Francis --

   THE COURT:  Not as an alternative to D&E?

   MR. FISHER:  Yes.

   THE COURT:  I mean it is an alternative, but D&E is better and that's why most people choose it.  And she says so.

   MR. FISHER:  Okay, but she offers it.

   THE COURT:  Yeah, that's right.  It's not going to kill -- the induced labor is probably not going to kill the woman.  So she offers it as an option, but why can't she offer, except for this legislation, the D&E as well, especially when that's the standard?

   MR. FISHER:  Right.

   THE COURT:  That's why I say this is a hard argument for you to make.

   MR. FISHER:  I understand.

   THE COURT:  You have argued that this legislation, this enactment, protects the integrity of the medical profession.  If I understand it, it's by protecting them from having to participate in such brutal procedures.  Where is your evidence of that?

   MR. FISHER:  It's -- evidence that?

   THE COURT:  The evidence that the medical profession needs protection.

MR. FISHER:  Oh, well, I think --

THE COURT:  Why is this different than a whole lot of other medical procedures?

MR. FISHER:  Well, it's certainly no different than partial birth abortion in that regard.  That's what the Supreme Court said we can regulate with the idea of protecting the integrity of the profession, and I don't think we need evidence to substantiate that.

THE COURT:  I just wondered what your evidence was that a D&E causes that sort of need for protection of the medical establishment.

MR. FISHER:  It's -- well, certainly Dr. Francis testifies to this, but more broadly, I think it's at the level of what do we worry about, what is a legitimate -- of legitimate concern to the General Assembly?  And the Supreme Court has already said that regulating abortion procedures, in fact, something almost identical to the D&E is justified by reference to protecting the integrity of the profession.  So I don't think that's something that we really need to revisit.

THE COURT:  Well, I guess I don't understand it, even when the Supreme Court writes it.  I don't know what integrity of the medical profession, and it's a reason you've cited.  I thought maybe you could elaborate.

MR. FISHER:  I can certainly elaborate.  I'm speaking in terms of evidence.  I think in terms of the rationale, the

idea is that the General Assembly wants to prevent doctors from being associated with what the legislature concerns, excuse me if this goes beyond what you want to hear, but this barbaric kind of treatment.  But this is something that when women who have gone through the procedure learn or have greater clarity later on about what they've been through, perhaps they didn't appreciate the details.

THE COURT:  Is that the Dr. Coleman theory?

MR. FISHER:  I'm not sure it's just Dr. Coleman.  I think that's part of what --

THE COURT:  She's your witness on that?

MR. FISHER:  Yes.

THE COURT:  Not a very good witness.  She's been discredited before --

MR. FISHER:  No, I think her rebuttal declaration -- I urge you to review it -- lists them very carefully, all of the studies that have attacked her and rebuts all of them very carefully.

THE COURT:  Or attempts to rebut them?

MR. FISHER:  Well, I think very effectively does.

THE COURT:  She responds.

MR. FISHER:  She points out the flaws --

THE COURT:  She's not a medical doctor, though, right?

MR. FISHER:  Oh, no, and she's not purporting to testify as one.  She is a methodological expert in terms of the

methodology of studies, and that's what she's reviewing when it comes to --

THE COURT:  I just don't think she compares apples to apples, oranges to oranges, and that's the weakness of her opinion.

MR. FISHER:  With respect to?

THE COURT:  We don't need to go further.

MR. FISHER:  Okay.

THE COURT:  What is your evidence that this law protects the dignity of fetal life by minimizing fetal pain? What's the evidence of fetal pain?

MR. FISHER:  I think there are studies that Dr. Francis talks about that suggests that the cerebral cortex is not necessary for the fetus to feel pain, and there is, I think, uncertainty about when exactly a fetus can begin to feel pain.

THE COURT:  Well, Dr. Bernard, at least, doesn't perform third trimester abortions, and if there is pain, it's in the third trimester, isn't it?

MR. FISHER:  No, I think that's where the dispute is. I think there's disputed science over precisely when the fetus starts to feel pain.  Certainly the 24 week is the one --

THE COURT:  Do you think that the standard D&E procedure is more painful than the fetal demise procedures?

MR. FISHER:  Well, Dr. Francis had a --

THE COURT:  Do you?  I'm not asking about Dr. Francis. I'm asking what your --

MR. FISHER:  I don't have personal --

THE COURT:  -- theory.  I'm asking about your theory.

MR. FISHER:  My theory is that a fetus that experiences a needle is going to feel less pain than a fetus whose limbs are ripped from it.  That is my theory.

THE COURT:  So you think that the fetal demise procedures are less painful than the standard D&E?

MR. FISHER:  For the fetus?  That would be -- that is my hypothesis.  Now, I'm not a scientist.  I don't -- I can refer you to Dr. Francis's response, which is along the same lines of what I've just said, which is look, you're talking about the --

THE COURT:  I don't think there's any good science that shows that there's fetal pain.  There are theories, but nobody's got any data on that.

MR. FISHER:  Well, there are -- there's data in terms of fetal reaction, fetal reaction to instruments.  I think there's uncertainty, and the uncertainty --

THE COURT:  I think that maybe that's as far as you can go is uncertainty.

MR. FISHER:  That may be, but I think that that uncertainty justifies legislative action.  If we aren't certain about, but we think we know there is a distinct possibility --

THE COURT:  When you're uncertain, and the action that you take is to take one procedure off the table, that seems to me to react without the data and without knowledge.  It's just -- at that point, it's a hunch basically.

MR. FISHER:  No, I don't think it's a hunch.  I think there's evidence.  There's no certainty, but there is evidence to support, as I've said, in terms of what we see --

THE COURT:  There's evidence to the contrary.  That's why you say that it's uncertain, right?

MR. FISHER:  Precisely, but --

THE COURT:  So when you have the uncertainty and the action is to take one of the procedures off the table, that seems to me to be beyond what the data requires.

MR. FISHER:  Well, I think here we get into what can only be described as a lack of clarity between both the Gonzalez case and the Holden's Health versus Hellerstat case, which is when there is uncertainty, who sort of gets the benefit of the doubt?  If you read Gonzalez, it suggests, and this is -- we think the scenario is more closely kind of tracking our case.

THE COURT:  Well, constitutionally, the woman gets the benefit of the doubt, right?

MR. FISHER:  Not from Gonzales.

THE COURT:  When the interests would otherwise be a face off?

MR. FISHER:  Not according to the Gonzalez decision.
I think certainly Hellerstedt makes it more likely that that's
the case, but that's a different -- in our view a different
scenario where you're talking about procedures that are
purported to protect the woman's health as opposed to other
interests.

Gonzalez speaks in terms of deference to what the
Government's judgment might be about.  Now the question that I
think the parties have raised for the Court, I think what's
unclear is does Hellerstedt somehow overrule Gonzales?  It
doesn't say that it does.  Does Gonzalez apply because -- here
because this scenario was more akin to the partial birth
scenario.  That's our argument --

THE COURT:  Why do you think the procedures that are
recommended as alternatives to the D&E are not in common use by
the medical community?

MR. FISHER:  I don't know.  I've been wondering that
myself.

THE COURT:  It's a good question, isn't it, Judge
Barker?

MR. FISHER:  It really is.  I've been trying to figure
that out, and I don't have an answer to that, but --

THE COURT:  Don't you think it's telling?  I mean,
you're willing to go with the speculation and hypothesis and
theories here.  Don't you think that there's some theories that

that fact compels?

MR. FISHER:  No.  Look, it may be because there's marginally more burden for those other procedures, but --

THE COURT:  Burden meaning?

MR. FISHER:  You know, certainly more time.

THE COURT:  Harder?

MR. FISHER:  Not harder.

THE COURT:  Could it be more painful?

MR. FISHER:  It's just something that has more -- there are things that have to be done besides what -- it doesn't make it an undue burden.  It just means not every burden is an undue burden, but I think --

THE COURT:  Do you know any doctors who can perform and do perform these surgical alternative methods as a regular part of the practice?

MR. FISHER:  Dr. Berry does as a matter -- when he does fetal reductions, he does KCL injections.

THE COURT:  He does them as alternatives to D&Es?

MR. FISHER:  Oh, no, he's not -- I'm just talking about as a matter of doing --

THE COURT:  Do you know of any doctors who perform these alternative surgical methods?

MR. FISHER:  No, I do not.

THE COURT:  No.  I didn't find any evidence of that.

Isn't it true that the statute compels women to use

these alternative procedures, even if they don't want to?

       MR. FISHER:  Well, it compels -- I mean, I'm reluctant to say --

       THE COURT:  A woman who wants to get a second trimester abortion is forced to resort to one of the alternative procedures even if she doesn't want to under this statute?

       MR. FISHER:  Right, although I would say that there is a volitional decision and act antecedent to that, which is the decision to have the abortion.  Now, no one is coercing the woman to have the abortion.

       THE COURT:  That truly is not responsive.  Once a woman has decided to have an abortion, then whatever she thinks about a D&E, she can't go that direction.  So the statute requires her to use the alternative procedures, right?

       MR. FISHER:  That is true.  The same is true for the partial birth procedure.

       THE COURT:  Well, I'm talking about this statute.

       MR. FISHER:  Understood.  I'm just pointing out this is not unique.

       THE COURT:  And whatever you say about the alternative procedures, if the woman seeking the abortion concludes that it's likely to be more painful and dangerous, and more intrusive and more expensive, but those are not factors that she can include in her assessment because the D&E is no longer

available to her; is that right?

MR. FISHER:  Relative to one another obviously she could, but not relative to the D&E.

THE COURT:  She can't sidestep those consequences of these alternate procedures, right?

MR. FISHER:  Once she's into that second trimester phase, the first trimester procedures are no longer available, yes.

THE COURT:  Do you agree that D&E's are safe?

MR. FISHER:  I -- the --

THE COURT:  The data that was in the filings is that the complications are fewer than one percent with respect to those procedures.

MR. FISHER:  Yes, although there are complications.

THE COURT:  Sure.  I'm saying do you think that D&Es are safe as measured by those statistics?

MR. FISHER:  As measured by those statistics, for the woman, yes.

THE COURT:  You don't have any contrary statistics?

MR. FISHER:  I don't have any contrary statistics.

THE COURT:  And this procedure, the D&E, accounts for more than 95 percent of the abortions in the U.S. after the second trimester; isn't that true?

MR. FISHER:  Well, I think that that figure is disputed.  I think that --

THE COURT:  Do you have a different number?

MR. FISHER:  I can't point my finger to something.

THE COURT:  The figure that was in the briefing was that the D&E accounts for more than 95 percent of the abortions in the U.S. after second trimester time periods have been met.

MR. FISHER:  I would only point out and that I think even Mr. Falk had conceded that there was some dispute over the exact figure.

THE COURT:  So what's the range of dispute?

MR. FISHER:  I think it's 50 percent to sort of at the bottom.

THE COURT:  More than 50 percent?

MR. FISHER:  More than 50 percent at the bottom, yeah.

THE COURT:  More than 50 percent of the abortions at second trimester are done by D&Es, right?

MR. FISHER:  I think that's right, yes.

THE COURT:  Right.  And the figure that said 95 percent in the briefing might not be that much, but it's still way more than half, right?

MR. FISHER:  I think that's right.

THE COURT:  Okay, thank you.  Where the alternate procedures are being used, according to the briefing, they are being used primarily to avoid legal risk as opposed to medical risk; isn't that true?

MR. FISHER:  I think that's right.

THE COURT:  Because there is no medical benefit that outweighs the D&E by the alternative?

MR. FISHER:  I'm not aware of any science that suggests that.  And certainly I don't think the law was enacted with that in mind.

THE COURT:  You agree that it's impossible to know in advance if any of the alternate procedures will work?

MR. FISHER:  I wouldn't agree with that in all cases. I think probably different patients present different circumstances and risks, and maybe in some cases it can be knowable in advance.

THE COURT:  Well, there's a higher likelihood, but it's not -- it is impossible to know for sure because it's like any other medical procedure, right?

MR. FISHER:  Right.  Well, but then, of course, the same is true for the D&E.

THE COURT:  Okay.  We spoke earlier about the physicians ethical obligation to give the best possible care to her patients.

So if the physician decides that it's not possible to recommend one of the alternate approaches, especially vis a vis the D&E, she is constrained ethically in the choices that she can offer to her patients or pursue, true?

MR. FISHER:  Well, I think the physician in that position could refer the patient to someone else.

THE COURT:  Where?

MR. FISHER:  Well --

THE COURT:  Not in Indiana.  Do you want them to go to another state?  That's a debunked theory, Counsel.

MR. FISHER:  No, no, I'm not advocating that.  What I'm --

THE COURT:  Georgia maybe?  Alabama maybe?  What are you suggesting?

MR. FISHER:  Well, what I'm suggesting is that I think that gets us into another area of kind of legal uncertainty, shall we say, where the question is how much responsibility has to be placed at the feet of the state versus the physicians.

THE COURT:  If a physician has a medically-derived judgment that a D&E is the preferable procedure, and she has an ethical obligation to take the best possible care of her patients, and she believes that the D&E provides that, vis a vis the alternates, she cannot satisfy her ethical obligation under those circumstances and under this law; isn't that true?

MR. FISHER:  Well, yes, perhaps but I don't think that ethical judgment of the physician, the individual physician, is sacrosanct, and I would refer the Court again to the partial birth abortion scenario.  The same thing could be said --

THE COURT:  But I'm talking about the dilemma that doctors are placed in by the medical licensing board.  That's

your defendant, that's plaintiff's defendant, the members of
the Indiana Medical Licensing Board, when that licensing board
has to also take into account what the ethical obligations are
of the people that they regulate.

   MR. FISHER:  I see what you're asking, yes.

   THE COURT:  So however they're going to thread the
needle here, it's going to go against the ethical duty of
physicians to the extent that the medical judgment is
foreclosed by the statute.

   MR. FISHER:  Well, I don't think we know that because
I don't think we know that the medical licensing board would
agree with Dr. Bernard about what the ethics would require her
to do.

   THE COURT:  You had to misconstrue my question in
order to answer it that way.

   MR. FISHER:  I'm sorry.  I didn't understand it then.
I'm sorry.

   THE COURT:  So the medical licensing board when it
comes time to enact the rules and regulations that flow from
this law where a physician believes in the physician's medical
judgment that the D&E is the preferred medical treatment, and
the ethical duty of the physician is to provide the best
possible care for her patients, the medical licensing board is
going to run into the tension between the ethical duty and the
statute, right?

          MR. FISHER:  Well, that's only true if the

physician -- if each physician gets to make their own

determination about that ethical decision.

          THE COURT:  Well, no, but the physician -- the D&E is

a standard.  You've already conceded that is a standard

procedure for second trimester abortions.  And it's safe.  And

it's used most of the time, if not 95 percent of the time, more

than 50 percent.  So it doesn't have to be decided on an ad hoc

basis --

          MR. FISHER:  Well --

          THE COURT:  -- and the medical licensing board won't

take it up that way.

          MR. FISHER:  If we're talking about the ethic of the

D&E itself, it is not a sacrosanct decision for the physicians.

It is something that the legislature may --

          THE COURT:  Wait, wait, wait, prior to this law, it

was available and ethical, right?

          MR. FISHER:  Uh-huh.

          THE COURT:  And a physician could prescribe that and

perform that?

          MR. FISHER:  Right.

          THE COURT:  And be safely within the ethical duties?

          MR. FISHER:  Right.

          THE COURT:  That's all I'm trying to say --

          MR. FISHER:  Okay.

THE COURT:  -- is that by taking this option off the
table, you created an ethical dilemma for the doctors and for
the board who's going to try to figure out ways for the doctors
to stay ethical.

MR. FISHER:  My, I guess, observation and response is
there is a role for the General Assembly to play when it comes
to delineating the outer boundaries of medical ethics.  That is
true with respect to, for example, the partial birth abortion
procedure, and it is true here.  The legislature may look at
the consequences or the actions that occur in a D&E and decide
we think ethics, medical ethics, ought to have a different
limit than the physicians think.

THE COURT:  Well, this wasn't made on the basis of
medical ethics.

MR. FISHER:  I'm sorry?

THE COURT:  This law was not written on the basis of
medical ethics.  The legislature was not defining medical
ethics.

MR. FISHER:  I think they were.  I think they were.

THE COURT:  What they did was outlaw a procedure that
previously had been available to ethical physicians.

MR. FISHER:  Because they think that the procedure is
unethical.

THE COURT:  Well, they made it unlawful.  That's what
I'm trying to get you to say is there is an ethical aspect of

this that is intention.

MR. FISHER:  There's an ethical aspect from the
perspective of some physicians that is intention.  Not from
every physician.

THE COURT:  And from the perspective of the science
itself.

MR. FISHER:  Well, I don't think that the science
determines the ethics.  I think that the ethics stand
independent of the science.

THE COURT:  No, I can't even accept that.  So let's go
to another subject.

MR. FISHER:  Okay.

THE COURT:  That sounds like other kinds of science
denial.

Gonzalez said that the focus is supposed to be on
safety, effectiveness, and the prevalence of available
alternatives, right?

MR. FISHER:  Right.

THE COURT:  So do you think the alternatives are safe,
effective and prevalent in the sense that they can be secured
by people in the public who want to avail themselves of it.

MR. FISHER:  Yes, I think the induction is the one --

THE COURT:  It's certainly not available, is it?
These alternates, you told me there are no doctors who are
doing them.

MR. FISHER:  Induction is available, and there is a question again --

THE COURT:  But really, they are down to one, down to one alternative.

MR. FISHER:  There's a claim by the plaintiffs that they don't know and can't learn how to do other procedures, but I think there's something incumbent upon them to learn.

THE COURT:  So take induction off because I know you have a different argument for that, but all the other alternatives are for all practical purposes not available, right?

MR. FISHER:  Subject to -- yes, subject to --

THE COURT:  As we speak, as of July 1?  As of July 1 --

MR. FISHER:  Well --

THE COURT:  -- they will not be available, right?

MR. FISHER:  There's time between now and July 1 where physicians can learn to do the procedures.

THE COURT:  Is that your best argument?

MR. FISHER:  Between the time the law was enacted.  I mean Dr. Berry makes it clear that these are procedures --

THE COURT:  Do you know anybody who is training --

MR. FISHER:  No.

THE COURT:  -- physicians?

MR. FISHER:  No, I don't but see, I think that's part

of what, I think, is important to take into account.  There is
some burden on the physicians to take actions where they can
comply with the law.

THE COURT:  Let's say they don't do that, they don't
undertake the burden.  So as of July 1, there's nobody who's
going to be able to do these except for induction.

MR. FISHER:  That's true, but I don't think --

THE COURT:  So that means it's not an available
alternative as of July 1.

MR. FISHER:  I don't think that's fairly --

THE COURT:  You're before the Court for injunctive
relief.  I mean, you're fending if off but the plaintiff is
seeking injunctive relief that is pinned to July 1.

MR. FISHER:  Understood.

THE COURT:  So by July 1, do you think there's going
to be a host of physicians who are able to do these
alternative --

MR. FISHER:  No, but that's only because of their own
unwillingness --

THE COURT:  For whatever reason.  There are a lot of
things they won't be doing, right?

MR. FISHER:  Sure.

THE COURT:  So by July 1, the only alternative that is
available to the D&E when analyzed on the basis of safety,
effectiveness and availability is the induction; isn't that

true?

MR. FISHER:  According to the testimony of the plaintiff, that is true.

THE COURT:  Well, do you have anything --

MR. FISHER:  No, I don't.  I don't.  The reason I say that is because they're the ones who say they don't know how to do the prior procedures and are not going to get training.  So that's all I mean.

THE COURT:  But you don't have any --

MR. FISHER:  No.

THE COURT:  -- argument or facts to the contrary?

MR. FISHER:  The facts I think would be that Dr. Berry, among others, would be willing to teach them if they wanted to learn.

THE COURT:  Can you think of any other medical procedure that is safe, reliable, easy, minimally invasive, and efficacious that is outlawed in any other aspect of medical care?

MR. FISHER:  The only thing that comes to mind is the partial birth abortion.

THE COURT:  Yeah, only abortion.

MR. FISHER:  That's it, right.

THE COURT:  So the abortion laws are sui generis.

MR. FISHER:  I think in many different ways, that's true.

THE COURT:  You can't think of any other medical procedures where --

MR. FISHER:  No.

THE COURT:  -- the legislatures, plural, have imposed these kinds of restrictions --

MR. FISHER:  Right.

THE COURT:  -- on what is otherwise regarded as a safe, reliable, easy, minimally-invasive procedure?

MR. FISHER:  That's true, but, of course, the Supreme Court has said that states can regulate abortion differently because --

THE COURT:  I know that.  I'm asking if you know of any others.

MR. FISHER:  I don't know of any others.

THE COURT:  I don't know of any others either.

Do you know of any other areas of medical practice and procedure where, by law, a physician is required to utilize procedures that, as the plaintiffs say, are untested, potentially painful and dangerous, and serve no medical purpose?  Do you know of any other area?

MR. FISHER:  Well, when you put it that way, no, I don't.

THE COURT:  Well, that's what the plaintiffs have argued.

MR. FISHER:  Yeah.

THE COURT:  So I'll have to figure out who's got the better side of that.

MR. FISHER:  Understood.

THE COURT:  Would you like to address the bodily integrity?

MR. FISHER:  Right.  I think that the bodily integrity argument really boils down to a sort of alternative to the abortion undue burden framework.  I don't see why it's necessary.  It seems to me the Supreme Court, to the extent it's been willing to entertain a right to undergo a procedure with respect to the termination of pregnancy, has put all of that within the abortion framework.

I think that's where all of the analysis needs to take place.  I don't think it adds anything to say, well, even if somehow, you know, even beyond the right to abortion, there is a separate right, I guess a super right of some kind, especially when we're not talking about something like where the State comes in and requires blood for a search, or as part of a seizure.  There just isn't any case that suggests that this is -- there is some alternate theory to protect this procedure other than the right to abortion itself.

THE COURT:  The Danforth decision uses this phrase. It may not -- I'm reading from my notes, so I might not have gotten it as a precise quote, but this was the gist that Danforth held that "Prohibiting the abortion method most

commonly-used nationally by physicians after the first
trimester is unconstitutional."  Isn't that what Danforth held?

          MR. FISHER:  I don't have that context in front of me,
so I'll take your word if that's what it said, but I don't
think anybody's arguing that the case -- this case is
controlled by Danforth.  I think --

          THE COURT:  Yes, but isn't that what that court held?

          MR. FISHER:  I don't have it in front of me.  I'll
take your word for it.

          THE COURT:  You should take my word for a few things.

          MR. FISHER:  Agreed.

          THE COURT:  I've got about two more minutes on your
time.  Do you want to make an argument that we haven't --

          MR. FISHER:  It's hard to believe I would have
anything left after all that, Your Honor.  You know, the view
of the State is that this is very much in line with what
Congress did with the partial birth abortion act in terms of
regulating a procedure -- and I won't go into detail, to go
back to our earlier conversation -- is ethically problematic.
And it is within their authority to do that.

          We have demonstrated that there are alternatives
available, that this is not going to impose an undo burden on
women, and for that reason, we think the Court should deny the
motion for preliminary injunction.

          THE COURT:  Thank you, Mr. Fisher.

MR. FISHER:  Thank you.

THE COURT:  Mr. Falk, do you have need a rebuttal?

MR. FALK:  If I could have a minute, Your Honor?

THE COURT:  You may, a minute.  I'll give you two minutes for rebuttal.

MR. FALK:  Thank you.  Just three points, Your Honor. First, it makes no sense to continue to refer back to the partial birth abortion cases, but the State does because those cases made it clear that the D&E is the most common method of second trimester abortion.  And the only reason that the Court switched from finding a state partial birth abortion law unconstitutional in Stenberg to a federal law constitutional in Gonzalez was that the law could not be interpreted to prohibit the D&E.  So that reference is curious.

There was some discussion about the risk of induction. I would just refer the Court to the practice bulletin issued by the American College of Obstetricians and Gynecologists.

THE COURT:  Is that an exhibit?

MR. FALK:  42-1.

THE COURT:  That was one of the very few of the 600 pages you sent me that I didn't get read.

MR. FALK:  At page -- docket -- the ECF page 26 and the page of the article, page 2, second -- "Compared with D&E, termination by induction with misoprostol is less cost effective, is associated with a greater risk of complications

such as incomplete abortion, and may be prolonged." And that's where I think we are as far as science is concerned.

And lastly, Your Honor, Whole Woman's Health requires that this Court make the determination between what the state asserts its interests are versus the burdens. There's no doubt how serious the burden is here. This is a total burden, and we would argue that the State has very low interest, but there's no doubt how that weighing has to occur here.

Effective July 1st, women in Indiana will not be able to obtain second trimester abortions. That is the quintessential definition of undue burden. Thank you.

THE COURT: Thank you, Mr. Falk.

Counsel, thank you very much for your arguments this morning, and your repartee with me on the issues that have to be addressed in resolving the request for injunctive relief. I'm mindful, of course, of the July 1 deadline, and will push hard against it so that I can get my decision out prior to that date, and everybody will know how to organize their lives as of July 1 in the context of these issues going forward.

So I hope you won't pepper me with more exhibits or anything post-hearing. I have enough. So even if you think you've come across the definitive exhibit, save it for the case on the merits and you can bring it home then.

MR. FALK: Thank you, Your Honor.

THE COURT: If you'll restrain them yourselves and not

send me more stuff, I think I can work with what you've already given me.

        MR. FALK:  Thank you, I understand.

        THE COURT:  Thank you again very much.

            (Court adjourned at 11:45 a.m.)

**************************************************************

CERTIFICATE OF COURT REPORTER

I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.

/S/LAURA HOWIE-WALTERS   July 1, 2019

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division